STATE *ex rel.* THE CITY OF CHARLESTON, *Etc., et al.*

*v.*

EDGAR B. SIMS, *Auditor, Etc.*

(No. 10162)

Submitted May 3, 1949. Decided June 1, 1949.

KENNA, JUDGE, dissenting.

*Ira J. Partlow*, Attorney General, *John J. D. Preston, Walter F. Ball, Dennis Knapp, T. W. Peyton*, for relators.

*W. C. Marland,* Assistant Attorney General, *Milton S. Koslow,* for respondent.

*Blagg & White,* as amicus curiæ for Temperance League of W. Va., a corporation.

FOX, JUDGE:

The State of West Virginia, at the relation of the City of Charleston, the Town of New Martinsville, the City of Nitro, and the City of Huntington, all municipal corporations, organized and existing under the laws of this State, and who sue in behalf of themselves and all other municipal corporations of this State, invoke the original jurisdiction of this Court in mandamus, and have filed their joint petition herein seeking to compel Edgar B. Sims, Auditor of the State of West Virginia, to honor a requisition made by R. E. Talbott, Treasurer of said State, in the sum of $150,000.05, for the use and benefit of the relators and all other municipalities of the State, to be paid from a special fund in the treasury of the State, representing profits derived from the operations of the Liquor Control Commission of said State, above the amount of the authorized and required  operating and reserve fund thereof, to be distributed among all the municipalities in the State, in conformity with the provisions of Chapter 13, Acts of the Legislature, 1947. Said requisition was dated April 1, 1949, and covered the sums due said municipalities, in proper proportions, under the Act aforesaid, for the third quarter of the fiscal year beginning July 1, 1948 and ending June 30, 1949.

The said requisition, while dated April 1, 1949, appears to have been presented to the auditor not later than March 30, 1949, for on that date the auditor, respondent herein, advised the treasurer, by letter, of his refusal to honor the same, and the requisition was returned to the treasurer with the notation written on the fact thereof: "Rejected and returned for reasons assigned in attached sheets", signed by Edgar B. Sims. On the requisition appears the

following words and figures: "Draw checks as per list attached, covering April 1, 1949, distribution according to Chapter 9, Acts of the Legislature, 1945, as amended and re-enacted by an Act of the Legislature, regular session, 1947", and there was attached thereto a list of all of the municipalities in the State, and a statement of the amount of money which each was entitled to receive, set opposite the official name of each, said sums aggregating $150,000.05, the amount of the said requisition.

It would serve no useful purpose to include in this opinion the letter written by the auditor to the treasurer, inasmuch as the legal points raised in said letter, affecting the supposed duty of the auditor to honor the requisition, are set up in the answer of the respondent to the petition filed herein.

Following this action of the auditor, this proceeding was instituted. The petition, filed in this Court on April 18, 1949, alleged, among other things, the legal existence of the relators as municipal corporations; the election and qualification of the auditor; the existence of a special fund in the State Treasury, derived from profits accruing from the operation of the Liquor Control Commission of the State, in excess of the operating fund and the reserve fund required by law sufficient to permit the carrying into effect of the provisions of Chapter 13, Acts of the Legislature, 1947; the issuance of the requisition by the state treasurer on the auditor for $150,000.05, dated April 1, 1949, to be distributed, when honored, among the municipalities of the State, as provided for in said Act, and as set out in the list of said municipalities, and the statement of the amount of said fund to which each was entitled, attached to said requisition; the refusal of the auditor to honor said requisition for reasons given in the auditor's letter to the treasurer, mentioned above, and which letter is copied in full in the petition aforesaid; that the reasons assigned by the auditor for his refusal to honor the requisition aforesaid were insufficient, invalid and erroneous, and that he had neglected, failed and refused to carry out,

perform and render his duty under the act of the Legislature aforesaid, and, unless required by this Court to do so, would continue to so neglect, fail and refuse; avers the direct interest of the relators and all the municipalities of the State in the matter involved, the urgent public interest therein, and the lack of an adequate remedy other than mandamus; and, after first asking for the issuance for a rule to show cause, prays that a peremptory writ in mandamus be issued compelling the auditor to honor the requisition aforesaid, and for general relief. On April 20, 1949, we awarded the rule prayed for in said petition, and set the same for hearing on May 3, 1949.

At this point, it seems advisable that the pertinent provisions of Chapter 13, Acts of the Legislature, 1947, the statute involved in this proceeding, be copied herein. The statute, with the enacting clause thereof, reads:

*"Be it enacted by the Legislature of West Virginia:*

"That section nineteen, article three, chapter sixty of the code of West Virginia, as amended by chapter nine, acts of the Legislature, regular session, one thousand nine hundred forty-five, be amended and reenacted to read as follows:

"All moneys collected by the commission shall be credited to the operating fund until that fund reaches an amount sufficient for the current and routine requirements of the department, this amount to be fixed by the commission with the approval of the governor, and not to exceed at any time the sum of one million five hundred thousand dollars. The receipts in excess of the requirements of the operating fund shall be paid into the reserve fund until the amount of the reserve fund equals three hundred fifty thousand dollars.

"From receipts in excess of the requirements of the operating and reserve funds, the sum of fifty thousand dollars shall, upon requisition of the governor, be paid monthly into the state

treasury and credited to a special fund to be established for the purpose of state payments to municipalities. The money in such fund shall be apportioned by the treasurer among the incorporated municipalities of the state on the basis of population, determined as follows: ·
\*\*\*

"The amounts paid to municipalities are paid for the purpose of reimbursing the municipalities for their expenditures in enforcing state laws for the protection of life and property.

"All receipts of the commission, not otherwise disposed of by this section, shall, upon requisition of the governor, be paid monthly into the state general revenue fund."

The answer of the respondent, filed May 2, 1949, after admitting certain allegations of the petition aforesaid, denies the right of the relators to the writ prayed for on grounds stated as follows:

"1. Said requisition was drawn upon the office of your respondent pursuant to a statute (Chapter 60, Article 3, Section 19, Code, as amended by Chapter 13, Acts of the Legislature of West Virginia, Regular Session, 1947) which your respondent believes is an unconstitutional statute, in that it violates Article VI, Section 51, subsection C of the West Virginia Constitution.

"2. That said requisition was drawn upon the office of your respondent pursuant to a statute (Chapter 60, Article 3, Section 19, Code, as amended by Chapter 13, Acts of the Legislature of West Virginia, Regular Session, 1947) which your respondent believes is an unconstitutional statute. Your respondent avers that the statute in unconstitutional because it is in violation of Article X, Section 6 of the West Virginia Constitution.

"3. That your respondent is informed and believes that such moneys as were requisitioned by the State Treasurer are not in reality paid to

municipalities for their aid to the State of West Virginia in enforcing the laws of the State of West Virginia, but, on the contrary, the declaration to that effect contained in Section 19, Article 3, Chapter 60 of the Code of West Virginia, as amended by Chapter 13, Acts of the Legislature of West Virginia, Regular Session, 1947, is an arbitrary declaration, not justified, and an invalid attempt by the Legislature to grant gratuities to municipalities of the State of West Virginia by arbitrarily declaring that such moneys are paid for the purpose of reimbursing municipalities for their enforcement of state laws for the protection of life and property. * * *"

To this answer the relators, on the same day, interposed their joint and several demurrer, by which the sufficiency of the matters of defense set up in said answer are directly challenged, and upon the issue of law so made, this proceeding has been submitted for final decision.

While other questions are raised, it is quite obvious that the fundamental question involved is whether Section 13, Acts of the Legislature, 1947, violates the provisions of Section 6 of Article X of our State Constitution, and this question will be first considered. However, as a preface to such consideration, we will discuss certain basic questions of law which, in our opinion, have a direct bearing on the main question stated above. They are:

First. The special fund out of which it is proposed to reimburse municipalities for their expenditures in enforcing State laws for the protection of life and property, must be treated as State revenue, and subject to lawful appropriation by the Legislature. The fact that same represents profits accruing from the operations of the Liquor Control Commission of the State, and that the money proposed to be distributed is paid into a special fund of the State Treasury to facilitate the stated purpose is unimportant. It is still public money. No so-called dedication of the special fund to a particular purpose makes any change in its status as a public fund of the State deposited

in its treasury. It would be so even if the operations of the Liquor Control Commission were, as contended in relators' briefs, proprietary rather than governmental; because, after an operating and reserve fund is set up, the profits made are required to be paid into the State Treasury. However, the operations of the said Commission have been held by this Court to constitute the exercise of a governmental function. In the case of *Schippa v. Liquor Control Commission,* decided November 16, 1948, and not yet reported, we held: "The State Liquor Commission is an agency of the State, engaged in the performance of governmental functions and duties, and, as such, is, under Section 35 of Article VI of the Constitution of this State, immune from suit."

Second. Except as limited by the provisions of the Constitution of this State, or by the delegated constitutional powers of the Federal Government, or by some fundamental concept of government, the powers of the Legislature to levy and collect taxes for the necessary expenses of government, and to appropriate the proceeds of such taxes for public purposes, is supreme. These powers are inherent in the State, necessary to its functioning as a government, essential to its existence, and are vested in the legislative branch of our State government. Being so vested, courts, with due regard to the division of powers principle of our State and Federal Constitutions, should be slow to interfere with the exercise of these powers of taxation and expenditures, and will do so only in cases where it is clear that there has been a violation of some constitutional provision, or some fundamental concept of government. *State Road Commission v. Kanawha County Court,* 112 W. Va. 98, 163 S. E. 815.

Third. Although the Legislature possesses the broad powers of taxation and expenditures noted above, it can neither levy taxes, nor expend the revenues derived therefrom, or from other sources, and which become public funds, for anything other than a public purpose. The law on this point has been frequently stated in the so-called

"moral obligation" cases. See *Woodall v. Darst,* 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367; *Glover v. Sims,* 121 W. Va. 407, 3 S. E. (2d) 612; *State ex rel. Cashman v. Sims,* 130 W. Va. 430, 43 S. E. (2d) 805; *State ex rel. Adkins v. Sims,* 130 W. Va. 645, 46 S. E. (2d) 81; *State ex rel. Davis Trust Co. v. Sims,* 130 W. Va. 623, 46 S. E. (2d) 90; and *State ex rel. Bennett v. Sims,* 131 W. Va. 312, 48 S. E. (2d) 13.

Fourth. An appropriation, being for a public, as distinguished from a private purpose, and made to carry out a State obligation, even though a county or other subdivision of the government is required, under the law, to aid in the same, is constitutional and valid. See *State Road Commission v. Kanawha County Court, supra; Kenny v. Webster County Court,* 124 W. Va. 519, 21 S. E. (2d) 385; *State ex rel. Board of Aeronautics v. Sims,* 129 W. Va. 694, 41 S. E. (2d) 506. The Legislature may require a county court to aid in carrying out a State function, as has been held by this Court in the *Kenny* case, *supra,* and the case of *Road Commission v. County Court, supra;* but in the *Board of Aeronautics* case, we took pains to say that the Legislature could not appropriate public funds to pay existing obligation of a municipality incurred in and about the construction of an airport over which the State had assumed control.

Fifth. It can not be doubted that the enforcement of law, and the preservation of law and order, is a State function. In doing so, the State exercises an inherent power necessary to its existence, and one included within the meaning of the term "police power of the State". This power, whether independently inherent, or embraced within the police power aforesaid, which is likewise inherent in all sovereignties, is subject to legislative control, and may be, and frequently has been delegated to counties and municipalities. Under Section 24 of Article VIII, of our State Constitution, county courts are charged with "* * * the superintendence and administration of the internal police and fiscal affairs of their counties * * *." Under

Code, 8-4-10, the common council of a municipality may adopt ordinances "* * * to protect the persons and property of the inhabitants of such town, and to preserve peace and good order therein, and, for this purpose, to appoint, when necessary, a police force to assist the sergeant in the discharge of his duties * * *." By Chapter 15, Acts of the Legislature, 1943 (Michie Code, 1943, 8-4-25), it is "made the duty of the mayor and the police of a municipality to aid in the enforcement of the criminal laws of the State within the municipality, independently of any provision of the charter or of any ordinance or want of an ordinance of such municipality. * * *" Under Chapter 56, Act of the Legislature, 1937 (Michie Code, 1943, Article 4 of Chapter 8A), enacted to make effective the Municipal Home Rule Amendment to our State Constitution, Section 39 (a) of Article VI thereof, the cities organized thereunder are granted "the power to protect and promote the public safety, health, morals and welfare by the exercise of the powers granted by this article", and the Act provides that such city may provide for and maintain a police department, and "may exercise its police power to protect the public morals, safety and good order * * *." Unquestionably, every municipality in this State has had delegated to it a part of the police power of the State, to be exercised, as a general rule, within its borders, including the power to preserve order and assist in enforcing the laws of the State.

Sixth. It is fundamental and settled law in this jurisdiction that in passing on the validity of an Act of the Legislature, courts will resolve every reasonable doubt in favor of the constitutionality of the Act. We do not deem it necessary to cite authority in support of this statement.

Seventh. While this Court will always give due and respectful consideration to legislative findings or declarations, they are not binding upon us. True, "A legislative declaration of fact should be accepted by the courts unless there is strong reason for rejecting it." *Glover v. Sims, supra*. But, it has been held that a legislative finding or

declaration, that certain facts in relation to a claim against the State create a moral obligation on the part of the State to pay such claim, is not binding on this Court. See "moral obligation" cases cited above. See also *Berry v. Fox,* 114 W. Va. 513, 172 S. E. 896. We, therefore, conclude that the correctness of the legislative provisions, amounting to a declaration, that "the amounts paid to municipalities is paid for the purpose of reimbursing the municipalities for their expenditures in enforcing state laws for the protection of life and property", may be inquired into on the question of what was the real legislative purpose when the Act here involved was passed.

That the holdings of this Court, on this question are correct, is made manifest by the opinion of the Supreme Court of the United States in the case of *St. Joseph Stock Yards Co. v. United States,* 298 U. S. 38, wherein Chief Justice Hughes, speaking for the court said:

"* * * When the Legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these limits of power. The Legislature cannot preclude that scrutiny of determination by any declaration of legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the Legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights

have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded. It is said that we can retain judicial authority to examine the weight of evidence when the question concerns the right of personal liberty. But, if this be so, it is not because we are privileged to perform our judicial duty in that case and for reasons of convenience to disregard it in others. The principle applies when rights either of person or of property are protected by constitutional restrictions. Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority."

It is not inappropriate, we think, to discuss at this point the nature of municipal corporations, and their place in our political system. In 37 Am. Jur. 618, it is stated:

"A municipal corporation is a body politic created by organizing the inhabitants of a prescribed area, under the authority of the legislature, into a corporation with all the usual attributes of a corporate entity, but endowed with a public character by virtue of having been invested by the legislature with subordinate legislative powers to administer local and internal affairs of the community, as well as creating it as a branch of the state government to assist in the civil government of the state.* * *"

And on Page 620 of the same volume it is stated:

"Municipal corporations are bodies politic and corporate, created not only as local units of local self-government, but as governmental agencies of the state. They are involuntary political or civil subdivisions of the state created as agents of the state to aid in the administration of government. * * *"

As stated above, municipal corporations are the creatures of the State. Their origin is lost in antiquity. They existed at common law, and were used by the early colonists as arms and agencies of the State, the creation and control of which were exclusively vested in the legislative branch of the colonial or State government, and they have been so used, with increasing frequency, from colonial days to the present hour. As and when communities have developed, and population has increased and centered in a particular territorial location, need for local government, including the enforcement of local law and the preservation of order, provisions for streets and alleys, sewerage and other health activities, and various other essential community services, have led to the organization of municipal corporations known to our law as cities, towns and villages. With us, these corporations have been established and regulated by the Legislatures, either by special charter, or under general statutory authority. See Chapter 8 of our Code. In 1936 our Constitution was amended by adding thereto Section 39 (a) of Article VI, which amendment provided that the Legislature could no longer enact special laws for the incorporation of cities, towns and villages, and requiring it to provide by general law therefor, but providing that certain restrictions should be imposed thereon, and, in general, retained broad powers over municipalities organized thereunder. Carrying out the constitutional requirement, the Legislature by Chapter 56, Acts of 1937, provided for three classes of cities, each to contain a population of more than two thousand, to be organized by the people thereof, under what is termed the "Home Rule Procedure". All municipalities, however organized, still owe their existence to the State, and to each is delegated by the State certain police and fiscal powers. Provision is made, both by our Constitution and statutory law, for the laying of tax levies on property of all classes, and for the collection of license fees and other forms of taxes. Municipalities are given power to carry on all municipality activities, and, presumably, means for the liquidation of the cost thereof out of their

own revenues were intended to be provided for, without aid from the State. Aside from the restrictions imposed by our Constitution, and the laws enacted thereunder, with respect to fiscal affairs, and so long as no law or public policy of the State are violated, municipalities are free to conduct their affairs without any interference from the State, and although creatures of the State, and, in the final analysis, subject to its control, they are intended to constitute a separate and self sufficient local government, standing on their own resources, and, especially charged with local responsibilities. We think it is fundamental in our form of government, and particularly as between the State and its subdivisions, that each shall bear the fiscal burden of the government for which it is responsible. Financial aid means partial control at least, and on each occasion when aid is furnished the recipient loses some part of its freedom to act, and this should not be encouraged. Furthermore, the control which the State may exercise over municipalities has never been understood to carry with it the obligation to finance, in whole or in part, the operation of municipal government. We do not believe that the framers of our State Constitution ever contemplated that aid, in any form, would or could be extended by the State to municipalities out of State funds; but that, on the contrary, it was always contemplated and intended that, when organized, they were, in a sense, set free to function as local governments, and expected to do so without outside assistance from any source. We think this is an important consideration, because if we are correct in our assumption, it supports the theory of local self government, and relieves local communities of too much control from the centralized power of the State.

It may reasonably be assumed that the framers of our Constitution were familiar with the history and development of municipal corporations to that date. As is well known, the mother Commonwealth of Virginia incurred a large and burdensome debt, largely through the granting of aid, and the extension of credit to counties, municipalities and private corporations, in encouraging various

enterprises, particularly the construction of railroads, turnpikes, bridges, and other permanent works, designed to be of value to the general public. The recollection of the result of this mistaken policy on the part of Virginia was fresh in the minds of those who, in 1872, met to frame a new Constitution for this State. They attempted to set up guards against the repetition, by this State, of the policy which had brought so much grief to Virginia and its people, by providing in Section 6 of Article X of our Constitution, as finally proposed, and afterwards ratified and adopted by the people that:

> "The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever."

In the fact of this stern and unmistakable inhibition against granting "the credit of the State * * * to, or in aid of any county, city, township, corporation or person", the Legislature, in 1941, and, so far as we know, for the first time in the history of the State, embarked on a policy of aid to municipalities by direct payments to them out of public funds of the State, deposited in the State Treasury, and out of a special fund set up in said treasury, derived from profits accruing from the operations of the State Liquor Control Commission. This policy was first put into effect by Chapter 71, Acts of the Legislature, 1941, and amending Section 19 of Article 3 of Chapter 4, Acts of the Legislature, 1935, which was the Act under which the State Liquor Control Commission was set up, as an agency of the State government. This Act provided that out of money received from receipts of the Liquor Control Commission, in excess of operating and reserve funds, there should be paid into the State Treasury and credited to a special fund to be established for the purpose of State aid

to municipalities, the sum of $50,000.00 monthly, to be apportioned among the incorporated municipalities of the State, on the basis of population, as shown by the Federal census, or any later census taken by the State, and, be distributed quarterly by the State Treasurer on warrants of the State Auditor. The Act contained the following statement:

"The amount paid to each municipality, as the state's contribution toward the expense of enforcement by the municipality of state laws for the protection of life and property, shall be for the purpose of reimbursing the municipality for its expenditures in enforcing such laws."

Section 19 of Article 3 of Chapter 4 of the Acts of 1935, aforesaid, was amended by Chapter 9, Acts of the Legislature, 1945, but such amendment was confined to matters not material to any question here involved. The section was again amended by Chapter 13 of the Acts of the Legislature, 1947, as has been heretofore noted. It will be observed from reading the 1947 Act, that instead of the provisions that a special fund be established for the purpose of "state aid to municipalities", employed in the 1941 and 1945 Acts, aforesaid, the phrase "state payments to municipalities" was substituted. Then, solely as bearing on the true legislative purpose in making the several appropriations aforesaid, particularly that of 1947, and here involved, we take judicial notice of the enactment by the 1949 Legislature of House Bill No. 156. The paragraph therein, pertinent to this controversy, reads as follows:

"From receipts in excess of the requirements of the operating and reserve funds, the sum of fifty thousand dollars shall, upon requisition of the governor, be paid monthly into the state treasury and credited to a special fund to be established for the purpose of state payments to municipalities. During the biennium beginning on the first day of July, one thousand nine hundred forty-nine, from receipts in excess of the above requirements, the further sum of one hun-

dred thousand dollars, as additional temporary relief for municipalities, shall, upon requisition of the governor, be paid quarterly into the state treasury and credited to such special fund. The money in such fund shall be apportioned by the treasurer among the incorporated municipalities of the state on the basis of population, determined as follows :* * *."

Relators contend that the payment of State funds to municipalities, as provided for in the 1947 Act, does not violate Section 6 of Article X of our Constitution. They say in their brief that "credit means power to borrow" and that "credit as used in the first phrase of Section 6, Article X means that the state shall not grant to any of its subdivisions the state's power to borrow money. This was the sense in which the word was used by the framers of our constitution." In view of the circumstances in which our Constitution was adopted, we do not believe any such narrow meaning was intended. Unquestionably, credit is that which enables one to enter into an obligation to be met in the future, but that is not the only meaning which may be attached thereto. The setting up of a special fund in the State Treasury from which, under statute law, municipalities are told they may draw quarterly during each fiscal year a specified sum, depending upon their population, is, in our opinion, a plain granting of credit on which municipalities may depend in their planning of future expenditures, and future activities, in municipal government. Relators, in their petition filed herein, allege as one ground for their appeal to this Court the fact that:

"The matters presented in this Petition and in the prayer hereof are all matters of general and of urgent public interest, so that the fiscal affairs and governmental functions and activities of the Relator cities during the remainder of the current fiscal year and the succeeding years, as authorized, permitted and provided for in their respective municipal budgets, may be determined, provided for, or if necessary curtailed and *pro tanto* abandoned."

Of course, the payments involved are taken into consideration in the planning of municipal expenditures, just as revenues of municipalities from regular sources are considered, and all furnish the credit upon which the municipality may exist and plan for the future.

To pursue the relators' contention to its logical conclusion, it amounts to this: The State may, to the extent that it is permitted to borrow money, negotiate loans on its own credit, and distribute the proceeds thereof among the counties and municipalities of the State, without violating Section 6 of the State Constitution; but it may not grant its credit in aid of counties and municipalities in negotiating loans. Under relators' theory, the Legislature could appropriate and pay to the county courts of the State, for road construction, the proceeds of the bond issue recently authorized for the construction of secondary roads, or distribute among the counties the fund accumulated in other ways for road purposes. The best evidence that the Legislature has always believed that this could not be done is the legislation taking over for State control the secondary road system. But it would not be authorized to give aid to the counties in negotiating loans on their own resources for the same purpose. In our opinion, the Legislature is without power to do either, because each represents the granting of credit in aid of the fiscal body so favored, in violation of constitutional inhibitions. We think it was intended to make the inhibition apply to both credit and direct aid. We do not think it ever entered the minds of those who formed our State Constitution to permit direct aid to counties or municipalities by the State, whether by granting the State's credit or making direct appropriations. Certainly they never intended by one provision to prevent aid by the way of granting credit, and leave the way open for unlimited aid for local purposes by direct appropriations, thus opening wide the door to the danger they were seeking to foreclose. At the very most the State could only suffer from having to pay the sum necessary to liquidate and make good the credit it had extended. No doubt, in most instances the county or municipality would

redeem its obligation. The risk, therefore, might not be great. If it was intended to guard against this not too serious risk of loss, how can it be argued that it was intended to open wide the door for direct aid the total of which would operate to deplete the State treasury.

We do not think that the case of *Berry v. Fox, supra,* is in conflict with our views of the construction to be given to Section 6 of Article X of our Constitution. In that case, the Legislature by enactment made an appropriation of money from the general revenues of the State, derived from a specified source, to pay the interest and sinking fund requirements on bonds theretofore issued by counties and districts for road and school purposes. This Court in holding the Act unconstitutional used the following language in pt. 1 of the syllabus of that case:

"The Act of the Legislature designated as Committee Substitute for House Bill No. 64, passed December 9, 1933, purporting 'to appropriate from the general revenues of the state from taxes imposed by the Legislature on privileges, franchises and incomes of persons and corporations as authorized by section one, article ten of the constitution of West Virginia, as amended in the year one thousand nine hundred thirty-two, moneys to pay the interest, sinking fund and amortization charges of bond issues of counties, magisterial districts, school districts and other taxing districts, except municipalities, issued for roads, now used as a part of the state road system, and issued for schools, now used as a part of the state free school system, issued prior to the eighth day of November, one thousand nine hundred thirty-two,' is unconstitutional, null and void, because it involves the assumption of local debts by the state in violation of section 6, Article X, Constitution of West Virginia, which provides: 'The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any

county, city, township, corporation or person
* * *,'"

It will be noted that both the credit and the assumption provisions of Section 6 were treated as involved in that case. As a matter of fact there was, strictly speaking, no attempted general assumption of the debt of any county or district; it was confined to the current obligations of the then present fiscal year. Following Legislatures could have refused to appropriate money for that purpose. But whether it amounted to an assumption of debts, what the legislation did constituted direct aid to the counties, magisterial districts and school districts of the State. The Court, however, interpreted the Act as an assumption of indebtedness for the then current period, and did not directly discuss the granting of credit feature of the case. It did stress the point that the payment of an indebtedness by the State, in the creation of which it had no part, was a violation of the due process clauses of the State and Federal Constitutions. No one will say that the State has had any immediate connection or part in setting up the local police forces in the municipalities; therefore, it has had no part in creating the local obligations which the municipalities have incurred, and the case at bar deals with the same practice as that inveighed against in *Berry v. Fox.* But, we recur to our proposition, stated above, that however phrased, and notwithstanding the use of the word "reimburse", Chapter 13 of the Acts of 1947, sets up for the biennium beginning on July 1, 1947 and ending June 30, 1949, a special fund, on which the municipalities may draw for general purposes, at stated intervals, during that entire period. If this did not amount to granting credit to municipalities, what was it? How more effectively could a credit be established? Then, whose credit was granted? Obviously, that of the State. As stated in *Berry v. Fox,* "Unless plain and simple words have lost their meaning, section 6 of Article X of our present Constitution prohibits the legislature from granting the credit of the state or assuming debts and liabilities such as are in said section indicated, whether such assumption be done directly and

unequivocally or by indirection." We say, that in our opinion, Section 6 of Article X of our Constitution should be interpreted as prohibiting the granting of State aid to counties and municipalities, and that whether that aid is by direct appropriation, or by the granting of credit, is unimportant. In a matter of this importance, a play on words is not justified. We should endeavor to base our judgment on the purpose in mind when the Constitution was formed and adopted, and we think that purpose was to prevent a repetition of the practices which had proved so disastrous in the mother state, and we must not, at this late day, nullify, by legislative or judicial construction, the plain intent which the makers of our Constitution had in mind.

That the Legislature believed that a direct and un-explained appropriation of State funds, in aid of municipalities, violated Section 6 of Article X of our Constitution, is attested by the fact that in all of the legislation referred to above, it has taken pains to explain the purpose of the appropriation as one that might be classified as for a State, as distinguished from a local purpose. Its purpose along this line is made clear from the beginning. In the 1941 and 1945 Acts, the purpose is stated to be "state aid to municipalities". In the 1947 and 1949 Acts, the purpose is stated to be "state payments to municipalities". The word "aid" was no doubt eliminated from the later Acts because it was used in Section 6 of Article X of the Constitution. In all said Acts it is provided that the appropriation is made to "reimburse" municipalities for expenditures made by them in enforcing State laws, obviously for expenditures already made by them out of their own funds, with the knowledge that there would be a re-imbursement from the State. This, in all reason, was nothing more or less than the granting to them of State aid in the guise of a credit, the use of which it was known they could command at any time.

But it is contended by the relators that the legislative declaration of the purpose for which the appropriation

aforesaid was made, and its distribution provided for, saves the same from the inhibition contained in Section 6 of Article X of our Constitution. This requires consideration of how far we are bound by this legislative declaration, and how far we may go in the examination of the record, and other facts which we may properly consider, in determining whether such declaration is entitled to be accepted as a fact binding on this Court. Little need be said on the first proposition, beyond what has already been stated in this opinion. The statement made by this Court in *Berry v. Fox, supra,* that: "While legislative declarations are, of course, entitled to the highest and most serious consideration, they are not conclusive.", can not be improved upon, and we think represents the true rule established in this jurisdiction.

We are presented with the question of whether we may judge the legislative declaration in connection with our acquaintance with facts which are of common knowledge among informed persons, and those which are attested by our own records. In spite of the view of some, that courts should insulate themselves from all knowledge of happenings and events in the world about them, and pretend ignorance of that which among the mass of citizens is common knowledge, we entertain the view that we may, and should, take notice, not only of legislative enactments, but of current events of a public nature. This does not mean that we are permitted to take judicial notice of every current event; but, on the other hand, we are not required to close our eyes to things which are in plain view, especially in matters which concern the government of the State, of which we are a part. Proceeding on this basis, we know of the adoption of the tax limitation amendment to our Constitution in 1932; the difficulty in adjusting the agencies of government to the new system thus established; the limitation on the amount of revenues which could be raised from direct levies on property by the counties, school districts and the municipalities of the State, and the consequent limitation and reduction of the expenditures which they were permitted to make; the en-

forced curtailment of activities by municipalities and other taxing units, and the constant efforts to relieve the situations thus developed; that the 1941 Legislature was confronted with this situation, with respect to the municipalities of the State; and we are of the opinion that, notwithstanding the stated purpose of the Act in regard to the reimbursement of money expended by municipalities in the enforcement of State law, the real intent of the Legislature was, and has always been, to relieve municipalities in respect to the problems confronting them in connection with the administration of municipal affairs in general, as distinguished from aid to their law enforcement agencies. It is scarcely conceivable that the State, even if it felt that more vigorous steps should be taken to enforce law, would have followed a system of relying on municipalities to effect that purpose, without any plan therefor, or the exercise of any control whatever, especially when we consider the existence of the Department of Public Safety, which, in police matters, well and efficiently represents the State. Furthermore, if the Legislature really intended to use the municipalities of the State for law enforcement purposes, is it not reasonable to suppose that they would have done so by something more than make a mere declaration, incorporated in a fiscal enactment, with no provision for regulation, control or accounting. Then, the items of reimbursement range from less than $100.00 annually, for a small town, to almost $65,000.00 annually, for the State's largest city. Who will believe that $100.00 could have served any useful purpose in respect to law enforcement in the small town, or that the State's largest city was in need of $65,000.00 for law enforcement, in addition to the regular and established police departments in that city. The same reasoning applies to the cities and towns between the two extremes. In our opinion, the reimbursement theory was incorporated in the 1947 Act, as well as the other Acts mentioned, to afford color of legality for what the Legislature clearly considered legislation of doubtful constitutionality, when considered in connection with Section 6 of Article X of our Constitu-

tion. We do not think such a declaration should be permitted to be employed to gloss over and conceal what we believe was a plain violation of the Constitution of this State, and, therefore, we give to it no force or effect as justifying the enactment of Chapter 13, Acts of the Legislature, 1947.

The relators seem to rely on the cases of *State Road Commission v. Kanawha County Court, supra; Kenny v. Webster County Court, supra;* and *State ex rel. Board of Aeronautics v. Sims, supra,* as justifying the Legislature in enacting Chapter 13 of the Acts of 1947, aforesaid. We are unable to understand their application of these cases to the present controversy. In the case of *State Road Commission v. Kanawha County Court,* the statute required county courts of the several counties of the State to pay the expenses of acquiring rights of way for State highways. The State had been compelled to acquire certain rights of way at its expense, and brought suit against the County Court of Kanawha County to collect the sum expended by it therefor. The Act which authorized the State to collect in such a case was held constitutionnal. The State has always had the right to require of counties and municipalities the performance of certain services. The Legislature of the State controls the salaries of the county officials, and in many other ways regulates county expenditures. The construction of a highway in any county is naturally of local benefit, and the State at that time required the county to make contribution in the way of furnishing rights of way for the highways they proposed to construct. In the case of *Kenny v. Webster County Court, supra,* under a statute which provided that "The support of public assistance is hereby declared to be the responsibility of the State. The support of general relief is hereby declared to be the responsibility of the county. To the extent that a county is unable because of constitutional restrictions to meet reasonable costs of general relief as required by this article, the responsibility of the State is hereby recognized." The statute required the County Court of Webster County to devote a certain percentage of its reve-

nues for general relief, and failing to comply with State requirements, mandamus was employed to force the county court to do so. The point was made in that case that the statute involved was in violation of Section 6 of Article X of the Constitution, as furnishing State aid to counties in connection with general relief. We held the Act to be valid on the general theory that the State, having assumed the ultimate burden of all types of relief, had the right to call upon the counties for aid, and that the State's contribution did not amount to State aid to the county. In the case of *State ex rel. Board of Aeronautics v. Sims, supra,* there was involved an appropriation by the Legislature in aid of aeronautics, the amount appropriated to be distributed by an agency of the State created for the purpose of exercising the State's control over air traffic, airports, etc. We held that the control of air traffic had been declared to be a function of the State; that it was responsible therefor; that it could use State funds to advance aeronautics, either by establishing airports and other facilities, or by aid in the expansion of facilities already undertaken by the counties and municipalities in the State, and that Section 6 of Article X of the Constitution was not violated thereby. The State may always appropriate money for public purposes, in aid of one of its own enterprises, such as schools, roads and modern facilities for air traffic. On that theory it was decided in the Aeronautics case that Section 6 of Article X of the Constitution was not violated, when the Legislature exercised its undoubted right to aid enterprises for which the State has assumed responsibility. The last Legislature provided for the distribution of $10,000,000.00 in aid of school building construction, and in the Act distributing that amount to the several counties of the State it was required, in effect, that the funds so allotted to the several counties of the State be matched by each county. The case before us is quite distinct from that class of cases. Here is a plain unvarnished appropriation of $600,000.20 annually to aid municipalities, and, we think, to meet the general expenses and local needs of municipal government. The State can well take care of the enforcement of its laws,

and can require cooperation and assistance of municipal authorities without being called upon to make a contribution, based on some idea of reimbursement, for services which the municipalities are under statutory and moral duty to perform in any event.

The views we have expressed, taken alone, call for a denial of the writ prayed for. But the respondent has also raised a question as to the legality of the enactment of Chapter 13, Acts of the Legislature, 1947, growing out of the method employed in its enactment. We take judicial notice of the fact that this Act was passed on March 6, 1947, and that the Act making general appropriations for the expenses of the State government, commonly known as the budget bill, was passed on March 8, 1947. Subsection C of Section 51, Article 6 of the Constitution of this State provides that:

"Neither House shall consider other appropriations until the budget bill has been finally acted upon by both Houses, and no such other appropriations shall be valid except in accordance with the provisions following:* * *."

The section then provides the necessary steps to be taken to make effective an appropriation made after the budget bill has been enacted into law. We think the appropriation in aid of municipalities comes within the restrictions of Subsection C, aforesaid, and that the same is invalid for that reason. Under the plain terms of the Constitution, an appropriation, to be valid, must be either included in the budget bill, or passed after the budget bill has been enacted, and under the conditions and requirements necessary to make it effective.

The respondent questions the sufficiency of the requisition here involved on account of the alleged failure to furnish an itemized account covering the services for which payment out of State funds were to be made. There is no merit in this contention. The requisition drawn by the

State Treasurer has attached to it an itemized statement of the amount of money required to pay each municipality of the State for the third quarter of the fiscal year of 1948-9, and the requisition refers to the amendment of Chapter 9 of the Acts of the Legislature of 1945, and the amendment thereto brought about by an enactment of the Legislature, Regular Session, 1947, which could only mean Chapter 13, Acts of that session. We think the law has been complied with in this regard and that it would be impractical and unreasonable to require any further itemization.

We do not wish to be understood as being indifferent to the financial problems of the municipalities of the State, nor as critical of the Legislature in its efforts to relieve their situation. The steps which have been taken have been along the easy road, and have operated to postpone the day when a definite, final, workable, and, above all, a constitutional plan could be devised to meet the ever growing needs of the municipalities. Such a system must eventually be adopted, and there is no better time to do so than now. The plan heretofore followed by the Legislature does not commend itself as sound, but if it were merely considered unsound, we would not assume to interfere, for we have neither power nor inclination to dictate legislative policy. But, the Act here involved, is, in our opinion, unconstitutional as well, and being so, it should be so declared, whatever temporary confusion and inconvenience may result therefrom. Temporizing with unconstitutional processes is always dangerous. We feel impelled, therefore, to hold that Chapter 13, Acts of the Legislature, 1947, is unconstitutional, null and void, because in violation of both Section 6 of Article X, and Subsection C, of Section 51, Article VI, of the Constitution of this State; and, therefore, that the auditor of this State was under no legal duty to honor the requisition drawn on him by the State Treasurer, in the course of the distribution of State funds among the municipalities of the State as provided for in the Act aforesaid.

The peremptory writ in mandamus prayed for by the relators is denied.

, *Writ denied.*

KENNA, JUDGE, dissenting:

The majority has held that the act of the Legislature granting to municipalities, uniformly on the basis of their comparative populations, as the State's contribution to the expense of enforcing by municipalities of State laws for the protection of life and property, a certain percentage of the profits made by the Liquor Control Commission, if and when received, is in violation of Section 6 of Article X of our Constitution. That section reads as follows:

> "The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever."

I think the clear meaning of that section, which is necessarily based upon its entire context, is that the State shall not be obligated directly or indirectly for future payments of the debt of another of any nature. I do not believe the word "credit" as here used, includes cash paid, not in the discharge of an obligation, but simply the placing by the State of *money in hand* uniformly at the disposal of subordinate governmental units for a public purpose. I believe further that the section under consideration is a limitation upon the supreme power of the Legislature, and that a constitutional provision in derogation of that power should be strictly construed. In *State ex rel. Thompson v. McAllister*, 38 W. Va. 485, 488, 18 S. E. 770, Judge Dent, speaking for the Court, had this to say:

> "In determining this constitutional question, we find the rule plainly laid down in the case of *State v. Dent*, 25 W. Va. 19, in these words, to-

wit: 'Article 6, §1, of our constitution provides: "The legislative power shall be vested in a senate and a house of delegates." This obviously confers on them all legislative power, except such as they are prohibited by the constitution in other provisions from exercising.' And the person claiming that an act of the legislature is an infringement of the restrictions of the constitution must point out the provision plainly forbidding, either by express words or by inevitable implication, the passage of such act; and, if none such exists, the act, however unjust or unreasonable it may seem, is valid, and must be sustained by this Court. * * *."

Instead of applying that principle, the majority opinion, in order to limit the legislative power, has ascribed a much broader meaning to the word "credit" than the majority itself states is necessary, saying:

"* * * Unquestionably, credit is that which enables one to enter into an obligation to be met in the future, but that is not the only meaning which may be attached thereto. The setting up of a special fund in the State Treasury from which, under statute law, municipalities are told they may draw quarterly during each fiscal year a specified sum, depending upon their population, is, in our opinion a plain granting of credit on which municipalities may depend in their planning of future expenditures, and future activities, in municipal government."

The majority opinion attempts no further definition of the word "credit". It says only that it includes "The setting up of a special fund in the State Treasury", and thereby making available money in hand.

In using the word "credit" as a curtailment of the power of the Legislature, without other specific definition in so far as the act under consideration is concerned, and as being a "plain granting of credit *on which municipalities may depend in their planning of future expenditures and*

*future activities"* (Italics mine), the majority opinion ignores the fact that the act creates no future obligation upon the State, that the Legislature can at any time repeal it, and that all municipalities are chargeable with knowledge of that fact, and, hence that none would be warranted in incurring additional expenditures due to the legislative grants in question. Those grants cannot, of course, be treated as a gift because not completed by delivery nor as a declaration of trust by the State, binding future Legislatures. Whether the grants do nothing more than demonstrate a spirit of teamwork is a matter for the Legislature to decide: not the courts.

The majority opinion states that the decision of the Court is based upon the purpose that the framers of our Constitution had in mind. Fortunately, what that purpose was does not rest upon opinion nor conjecture, and I am quite willing to rest this dissent upon it not having included what I regard as this Court's gross enlargement of Section 6 of Article X. That section did not originate in the Constitutional Convention of 1872, where the majority opinion seems to assume the intention of the founders was voiced, but in the Constitutional Convention of 1861-63. If one will turn to Volume Three of "Debates and Proceedings of the First Constitutional Convention of West Virginia", there will be found, beginning, respectively, at pages 127 and 189, a full discussion of what are now Sections 4 and 6 of Article X of our Constitution. The reported discussion is exhaustive and, concerning Section 6, the plight of a number of states that encountered financial difficulty in underwriting private corporations that were granted the right to construct internal improvements, including the Commonwealth of Virginia the large indebtedness of which West Virginia expected to pay partly, is dealt with at some length. For example, the construction of the Erie Canal in 1822, and the fact that the State of New York had not in 1861 discharged the indebtedness then assumed by it for that purpose, although the canal had been from the beginning a money-making enterprise,

is dwelt upon. In this entire lengthy discussion not one word is said that could in any way be construed as aimed at limiting the power of the Legislature to dispose of the current earnings of a business in which the State is exercising a monopoly: money in hand. It is plain that what the Convention was doing aimed only at preventing the State from at any time or in any way obligating itself, either primarily or secondarily, to make payments in the future for another. If the framers had another purpose in mind, they said nothing of it. Our Constitutional Convention of 1872 changed neither the policy nor the language.

It may be that I do not correctly understand the position this Court took in *Kenny v. County Court of Webster County*, 124 W. Va. 519, 21 S. E. 2d 385. If I do, there are several statements in the opinion of the Court, written by Judge Fox, that are directly opposed to what the Court has held in the present case. In stating that the people are the source of all governmental power and that the Legislature is their direct representative with authority to exercise that power, except as restricted by constitutional provision, the Court recognized as enforceable, Code, 9-10-1, which reads:

> "The support of public assistance is hereby declared to be the responsibility of the State. The support of general relief is hereby declared to be the responsibility of the county. To the extent that a county is unable because of constitutional restrictions to meet reasonable costs of general relief as required by this article, the responsibility of the State is hereby recognized."

The last sentence of that section was attacked as being unconstitutional because in violation of Section 6 of Article X of our Constitution. In deciding that contention, this Court had this to say:

> "The mere fact that in carrying out this responsibility, the state, through its Legislature, requires contribution thereto by the counties,

does not prohibit the state from exercising its own prerogatives and from using the county courts as agencies in carrying out its own purposes, and the amount it contributes to the county general relief, by way of state aid, *is not lending the credit of the state to the county.*" (Italics mine).

Can the State extend financial aid to counties in the performance of their duties as agencies of the State, but not to municipalities? The present opinion says that the State can well take care of the enforcement of its laws and can require cooperation and assistance without being "called upon" to make a contribution. This mere statement shows conclusively that it is a matter for the Legislature and not for the courts. But assuming it to be a proper matter for discussion here, we have at present on duty around two hundred State Policemen with a population exceeding two million: one to each ten thousand. Enforcing laws for the protection of life and property can be conservatively estimated as costing municipalities on an average of fifty per cent of their gross revenue. The consumption of alcoholic beverages is a factor in a very large percentage of law violations, particularly where violence is involved. Nearly forty per cent of our people live in municipalities, not counting those who live in mining camps and unincorporated towns. It would seem unnecessary to say that the primary power and duty of law enforcement rests upon the State, that the police power of municipalities is only that delegated them by the State through the Legislature, and that through the Governor it may at any time, by the declaration of martial law, suspend a local unit's power in that regard, the State directly performing its duty of law enforcement. This so-called appropriation to municipalities simply was an aid to the legislative policy of keeping enforcement on a local basis and not endangering the State's being required to assist further in that actual operation.

Few will doubt that the sale by the State of alcoholic beverages is quite a material factor in the cost of law

enforcement, perhaps in a less degree that was National Prohibition. Certainly the load of that cost is borne in the main by municipalities. This fact was the reason for the extremely large license fees charged by them when liquor was permitted to be sold under license. The State of West Virginia is exercising a monopoly in that business from which in the last fiscal year it received a profit of not less than $9,000,000.00 or, with one hundred and twenty-four stores and agencies, an average yield of more than $72,500.00 a unit. By holding prices at a very high level the State's profit provokes bootlegging and many other violations of the law that usually accompany it, thus increasing the cost of law enforcement borne by municipalities. The finances of most, if not all, incorporated towns throughout the State are precarious, to say the least. As of June 30, 1949, the balance in the State's general fund exceeded the estimate submitted to the Legislature in the Budget Document by more than $3,133,000.00. Judging by the experience of the fiscal year just closed, this amount will be substantially augmented daily by the State's profit from the sale of liquor. With this rather outstanding contrast in their financial standing, is it to be wondered that the Legislature, as a matter of sound public policy within its exclusive control, under the circumstances saw fit to make available to governmental units of its own creation approximately one-fifteenth of its profit received from the sale of liquor within their boundaries?

What is said in the majority opinion concerning the State's borrowing money and distributing the proceeds among the counties and municipalities without violating Section 6 would be quite convincing were it not for Section 4 of the same article, which, in plain terms, prohibits the State from contracting a debt for any purpose not falling within the named exceptions.

The holding of the majority opinion that this allotment, allocation or contribution of funds is not included in the 1947 budget, is an obvious mistake. An examination of the Budget Bill in question shows that it was included in plain

terms and in exactly the same way that it was included in the three preceding budget bills, under all of which the State Auditor had approved payment without raising the question. In addition there is some doubt as to whether the expenditure of moneys received by the State, not as a part of its tax revenue but from independent sources, must be so included. See *Moses v. Meier,* 148 Ore. 185, 35 P. 2d 981; and *Ajax v. Gregory,* 177 Wash. 465, 32 P. 2d 560.

It is quite an interesting speculation concerning where the ultimate responsibility for money paid to the municipalities by the State since 1941 rests. Is money paid under an unconstitutional statute recoverable? Do the municipalities owe it to the State? If so, what are the duties of the Auditor and the Attorney General? See Code, 14-1-18, 19.