485 S.E.2d 407

WEST VIRGINIA TRUST FUND, INC., a West Virginia Non–Stock, Non–Profit Corporation, as Trustee, Petitioner Below, Appellant,

v.

Honorable Larrie BAILEY, Treasurer of the State of West Virginia, Respondent Below, Appellee.

STATE of West Virginia, ex rel. Honorable Darrell V. McGRAW, Jr., in his Official Capacity as the Attorney General of West Virginia, Petitioner Below, Appellee,

v.

WEST VIRGINIA TRUST FUND, INC., a West Virginia Corporation; and David Gardner, Chairman, West Virginia Trust Fund, Inc., Respondents Below, Appellants.

Stanley L. KLOS, Petitioner
Below, Appellee,

v.

Honorable Larrie BAILEY, Treasurer
of West Virginia, Respondent
Below, Appellee.

STATE of West Virginia, ex rel. Stanley
L. KLOS, Petitioner Below, Appellee,

v.

WEST VIRGINIA BOARD OF INVEST-
MENTS, a Body Corporate of the State
of West Virginia, Respondent Below,
Appellee,

and

West Virginia Trust Fund, Inc., a West
Virginia Corporation, Respondent
Below, Appellant.

No. 23939.

Supreme Court of Appeals of
West Virginia.

Submitted Feb. 25, 1997.

Decided March 28, 1997.

James K. Brown, and Wendel B. Turner, Jackson & Kelly, Charleston, for Appellants

West Virginia Trust Fund, Inc., and David Gardner.

Daynus Jividen, Senior Assistant Attorney General, for Appellee Larrie Bailey.

Deborah L. McHenry, Managing Deputy Attorney General and Rory L. Perry, II, Assistant Attorney General, for Appellee Darrell V. McGraw, Jr.

David J. Sims, Yahn & Sims, Wheeling, for Appellee Stanley L. Klos.

David L. Wyant, Shuman, Annand & Poe, Charleston, for Appellee Board of Investments.

Thomas J. Gillooly, Charleston, for Amici Curiae, The West Virginia Public Employees Retirement System Assoc., Inc., The West Virginia Assoc. of Counties, and The West Virginia Federation of Teachers.

Gary G. Markham and Kenneth G. Webb, Jr., Bowles, Rice, McDavid, Graff & Love, Charleston, for Amicus Curiae, Consolidated Public Retirement Board.

Marvin W. Masters and Richard A. Monahan, Masters & Taylor, L.C., Charleston, for Amicus Curiae, West Virginia Troopers Association.

Thomas A. Heywood, Bowles, Rice, McDavid, Graff & Love, Charleston, for Amicus Curiae, West Virginia Business & Industry Council.

William B. McGinley, Charleston, for Amicus Curiae, West Virginia Education Association.

Alison E. Patient, Charleston, Jennifer B. Walker, and M.E. "Mike" Mowery, for Amicus Curiae, West Virginia Legislature, President Earl Ray Tomblin and Speaker Robert Kiss.

STARCHER, Justice:

These four consolidated actions require us to interpret *West Virginia Constitution,* Article X, section 6, the constitutional prohibition against the State becoming a joint owner or stockholder in any company or association. In its 1996 session, the Legislature enacted the West Virginia Trust Fund Act, *W.Va. Code,* 44–6B–1 to –12, ("the Act") in an attempt to reconcile this restriction with the legislative goal of promoting the fiscal well-being of several State pension and workers' compensation funds. The proponents of the Act, in the proceedings before this Court, argue that the Act creates a non-stock, non-profit corporation called West Virginia Trust Fund, Inc. ("Trust Fund, Inc."), which will act independently of state government for purposes of investing certain funds. The Act will allow the State to place five state employee pension funds and the workers' compensation and coal workers' pneumoconiosis funds into an irrevocable trust fund managed by West Virginia Trust Fund, Inc., acting as the trustee of those funds. As trustee, Trust Fund, Inc., may then invest up to 60% of these funds in corporate equities. The proponents contend that these invested funds will then be owned by Trust Fund, Inc., and the State will no longer have any ownership interest. By placing ownership of the moneys with Trust Fund, Inc., it is contended that the investment of the moneys is insulated from the constitutional prohibition.

The circuit court rejected these arguments and declared the entire Act unconstitutional primarily on two grounds: (1) the Act violated *West Virginia Constitution* Article X, section 6, and (2) the Act usurped the inherent constitutional duties of the state treasurer. Accordingly, the circuit court ordered the dissolution of West Virginia Trust Fund, Inc.

After careful consideration, we conclude that West Virginia Trust Fund, Inc., is, to a highly significant degree, a state actor and instrumentality of the State. Therefore, the West Virginia Trust Fund Act essentially allows the State to indirectly invest employee pension funds and the workers' compensation and coal workers' pneumoconiosis funds towards becoming a joint owner or stockholder in companies and associations. Accordingly, we find that the Act is unconstitutional, and affirm the circuit court's decision in that regard. However, we disagree with the circuit court's finding that the Act interferes with the inherent constitutional duties of the office of state treasurer.

## I.

### Facts and Background

#### A.

### Legislative Action—1990

Effective August 31, 1990, the Legislature enacted *W.Va.Code*, 12–6–9(j) [1] which allowed a state agency, the West Virginia Board of Investments,[2] to invest state employee pension funds in "[a]ny corporate stock of any private corporation...." *W.Va.Code*, 12–6–9(j)[1990]. The West Virginia Board of Investments was and remains a "body corporate of the state" (*W.Va.Code*, 12–6–3 [1996]) charged with consolidating and managing "moneys, securities and other assets" of the state. *W.Va.Code*, 12–6–5(11)[1996]. In *State ex rel. Gainer v. West Virginia Bd. of Investments*, 194 W.Va. 143, 459 S.E.2d 531 (1995) we addressed *W.Va.Code*, 12–6–9(j) [1990] to determine whether corporate stock purchases by the Board of Investments were permissible under *West Virginia Constitution*, Article X, section 6. That constitutional provision, enacted in 1872, states (with emphasis added):

The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; *nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever.*

In *Gainer*, the appellee Board of Investments relied on our holding in *Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1988) and argued that the pension funds to be invested belonged to the pension beneficiaries, not the State. We were asked in *Dadisman* to consider the Legislature's failure to fund fully the Public Employees Retirement System ("PERS") and the Governor's drafting of budgets which diverted employee pension assets into the general revenue fund to pay public employee insurance premiums. We concluded in *Dadisman* that West Virginia law makes the State the trustee of state employees' pensions, so that the State has a fiduciary duty to protect PERS pension funds. We also concluded that the Legislature and Governor could not use pension funds for any purpose other than the interests of all pension beneficiaries. We stated:

Moneys earned by public employees and contributed to a public employees' retirement plan, including the employers' contribution which has been earned by the public employees, become part of the corpus of the trust and are not thereafter state funds for expropriation or use for any purpose other than that for which the moneys were entrusted.

Syllabus Point 21, *Dadisman*. Additionally, we held in *Dadisman* that state employees have contractually vested property rights created by the pension statute, and that those property rights cannot constitutionally

---

**1.** *W.Va.Code*, 12–6–9(j) was part of an omnibus bill which, *inter alia*, related to pension funds and the investment of those funds. The title of the omnibus bill states, in part, that it "provid[es] for the investment of pension funds in corporate stock and provid[es] restrictions on certain investments." The statutory amendment allowing for investment in corporate stock (subsection (j)) modified *W.Va.Code*, 12–6–9 to provide:

Notwithstanding the restrictions which may otherwise be provided by law as to the investment of funds, the board [of investments] may invest funds made available to it in any of the following:

. . . . .

(j) Any corporate stock of any private corporation or association organized and operating in the United States and which is also listed on the Standard and Poor's List of 500.

The Legislature passed the omnibus bill on August 31, 1990; it took effect on the date of passage. *See*, Chapter 8, *Acts of the Legislature, Third Extraordinary Session, 1990*.

*W.Va.Code*, 12–6–9 [1990] was repealed in its entirety in 1996 by the West Virginia Trust Fund Act. *See*, Chapter 258, *Acts of the Legislature, 1996*.

**2.** The State Board of Investments is composed of the governor, state treasurer and auditor. It was created in 1967 to invest and reinvest certain public funds in non-stock securities (*e.g.*, government or corporate bonds). *See 1967 Acts of the Legislature*, c. 162. In 1978, the power of the Board was clarified and expanded and it was allowed to "[c]onsolidate and manage moneys, securities and other assets of the pension funds and other funds and accounts of the state ..." *W.Va.Code*, 12–6–5(11)[1978]; *1978 Acts of the Legislature*, c. 58. In the 1996 West Virginia Trust Fund Act, this section was rewritten to remove explicit language concerning the Board's control over pension funds.

be impaired or diminished by the State. Instead, the State has a constitutional obligation to realize and protect public employees' pension property rights. Syllabus Points 16, 18, *Dadisman*.

In *Gainer*, we found that the Board of Investments' argument (that pension plan assets do not belong to the State) had taken the holding of *Dadisman* out of context. Accordingly, we clarified *Dadisman* by holding that the State *does* have an ownership interest in pension funds, and the State cannot use those assets in any manner or for any reason other than to benefit retiring state employees. We stated that:

> Until funds are withdrawn and paid out to individual members of the Public Employees Retirement System, the state has a beneficial ownership interest in such funds arising from the statutory trust relationship created by the enactment of the West Virginia Public Employees Retirement Act, West Virginia Code §§ 5–10–1 to –54 (1994 & Supp. 94).

Syllabus Point 3, *Gainer*.

*Gainer* held that the 1990 statute allowing the investment of pension assets in corporate equities by the state Board of Investments violated the clear language of Article X, section 6. Important to the case currently under consideration are two elements of our holding in *Gainer*. First, we held that until pension funds are paid out to individual members of the pension plan, West Virginia's *Constitution* and pension statutes impose an ownership interest on the State. *Gainer*, 194 W.Va. at 149, 459 S.E.2d at 537. Second, we stated that:

> The clear language of article X, section six itself stands as a bar to state ownership of corporate stocks. This result is compelled by virtue of the fact that article X, section six is written as an unconditional proscription of the State's investment in stock of any company or association.

*Id.* Accordingly, we concluded the statute under consideration was invalid and unenforceable under Article X, section 6. We stated that the plain and unambiguous language of our constitution "proscribes, without restriction, *all* instances of state involvement in the stock market." 194 W.Va. at 149–50, 459 S.E.2d at 537–38. We indirectly suggested that one method for permitting investment in the stock market was through a constitutional amendment [3] to allow the investment of pension funds in corporate equities. 194 W.Va. at 150, 459 S.E.2d at 538.

Our decision in *Gainer* was based on an analysis of authorities from several states. Each case involved an examination of constitutional restraints on the investment of state funds in corporate stocks. *See, ICMA Retirement Corp. v. Executive Department*, 92 Or.App. 188, 757 P.2d 868, *review denied*, 306 Or. 661, 763 P.2d 152 (1988); *Board of Trustees of the Public Employees' Retirement Fund of Indiana v. Pearson*, 459 N.E.2d 715 (Ind.1984); *Louisiana State Employees' Retirement System v. State, Through Dept. of Justice*, 423 So.2d 73 (La.App.1982), *writ denied*, 427 So.2d 1206 (La.1983); *Almond v. Day*, 197 Va. 782, 91 S.E.2d 660 (1956).

We noted in *Gainer* that the Board of Investments had cited only one case supporting its position that PERS funds were not state moneys prior to distribution to employees, and therefore could be used to purchase corporate equities. In *Louisiana State Em-*

---

3. We noted in *Gainer* that in 1978 Michigan had revised its constitution to allow the investment of public employee retirement or pension benefits in corporate stocks. *Gainer*, 194 W.Va. at 150 n. 8, 459 S.E.2d at 538 n. 8.

Subsequent to *Gainer*, Indiana's Legislature submitted a constitutional amendment to its voters at the general election held November 5, 1996. P.L. 4–1996, § 112. This amendment, allowing the investment of public employee retirement funds in stocks, was approved by the voters. *Ind. Const.*, Art. 11, § 12, now reads:

> The State shall not be a stockholder in any bank; nor shall the credit of the State ever be given, or loaned, in aid of any person, association or corporation; nor shall the State become a stockholder in any corporation or asso-

ciation. However, the General Assembly may by law, with limitations and regulations, provide that prohibitions in this section do not apply to a public employee retirement fund.

Also, the South Carolina General Assembly allowed its citizens to consider the propriety of investing state moneys in stocks. In November 1996, South Carolina voters approved by a three-to-one margin a constitutional amendment to *S.C. Const.*, Art. X, § 16, allowing the state's $15 billion pension fund to invest in stocks. The amendment specifies the structure of the investment body, the types of permissible investments and requires the General Assembly to enact implementing legislation. *See, State*, Columbia S.C., March 4, 1997 at B6.

*ployees' Retirement System, supra,* the Louisiana court determined that because the funds of its public employees' retirement system belonged to the members of the retirement systems, the funds were not subject to the constitutional prohibition against the state purchasing corporate stock. In *Gainer,* we were not persuaded by the Louisiana court's holding "as the reasoning of that decision is Spartan, at best." [4] *Gainer,* 194 W.Va. at 147, 459 S.E.2d at 535.

The *Gainer* opinion cited pension fund "ownership" reasoning from several state courts. From these cases we distilled a rule that the threshold test of constitutionality is whether there is state ownership of the funds in question. These cases suggested that so long as an instrumentality of the State and not the individual state employees control the money, the State continues to have a significant ownership interest in the funds.

The Oregon Court of Appeals in *ICMA Retirement Corp. v. Executive Dept.,* 92 Or. App. 188, 757 P.2d 868, *review denied,* 306 Or. 661, 763 P.2d 152 (1988) held that the constitutional prohibition against the state's purchase of corporate stock barred the investment of public employees' deferred compensation in corporate equities. In *ICMA* the court declared that the state had a "proprietary" or "ownership" interest in deferred compensation moneys. 92 Or.App. at 193, 757 P.2d at 870. In reaching this conclusion, we noted that the Oregon court rejected arguments similar to those advanced by the West Virginia Board of Investments in *Gainer.*

We also noted, in footnote 5 of the *Gainer* opinion, that a 1969 Oregon case had reached a different result. In *Sprague v. Straub,* 252 Or. 507, 451 P.2d 49 (1969) the court did allow the investment of its public employee pension assets in corporate equities. We pointed out in *Gainer* that Oregon has a statute declaring that " 'the State of Oregon and other public employers' have no proprietary interest in the Public Employe[e]s' Retirement Fund ..." and went on to say:

> *Sprague* is easily distinguished given this state's lack of comparable legislation declaring the state's lack of a proprietary interest in the PERS combined with our prior enunciation in *Dadisman* of the fiduciary obligations imposed on the state in connection with investment of PERS funds. *See* 181 W.Va. at 794–95, 384 S.E.2d at 831–32 and syl. pt. 25.

*Gainer,* 194 W.Va. at 147 n. 5, 459 S.E.2d at 535 n. 5.

Our decision in *Gainer* was delivered May 31, 1995. In the 1996 session the Legislature again addressed the issue of investing state funds in corporate stocks.

### B.

#### The West Virginia Trust Fund Act—1996 [5]

For many years both the legislative and executive branches of our state government have struggled with the funding of the State's several pension plans. The Legislature has, in good faith, labored long at funding these pension plans, as well as restructuring the Workers' Compensation Fund, so they will be viable and actuarially secure in the future. The West Virginia Trust Fund Act is a recent effort to advance the laudable goal of actuarially strengthening the State's pension and workers' compensation funds.

The Act represents an attempt by the Legislature to reconcile the Legislature's wish to maximize investment return on certain funds with the restraints imposed by the *Constitution.* The Act attempts to eliminate or reduce to constitutional insignificance the state ownership of various state employee

---

**4.** We believe a significant, albeit unstated, reason for the Louisiana court's decision was that the *Louisiana Constitution* specifically excludes retirement pensions from the state treasury. It states:

> (A) Deposit in State Treasury. All money received by the state or by any state board, agency, or commission shall be deposited immediately upon receipt in the state treasury, except that received: ...

(4) by retirement system funds; ...
*La. Const. of 1974,* Art. VII, section 9(A)(4).

**5.** Rather than quote individual sections of the West Virginia Trust Fund Act, *W.Va.Code,* 44–6B–1 to –12 [1996], in a piecemeal fashion as they are discussed, for the reader's convenience we have attached the entire Act as an appendix to this opinion.

pension and workers' compensation funds. First, it creates a public, non-profit, non-stock corporation known as West Virginia Trust Fund, Inc., and an irrevocable trust to be managed by the new corporation as trustee. The Act then requires the state treasurer to pay over to Trust Fund, Inc., nearly $4 billion dollars. The Act declares that the State has "no proprietary interest" in these moneys. *W.Va.Code,* 44–6B–2. Lastly, Trust Fund, Inc., is required to prudently invest these assets, up to 60% of which may be in corporate equities. *W.Va.Code,* 44–6B–12.

The key enabling statute is *W.Va.Code,* 44–6B–4, which creates the new public corporation, West Virginia Trust Fund, Inc. It provides that:

> There is hereby created the West Virginia trust fund. The fund is created as a public body corporate and established to provide prudent fiscal administration, investment and management for the pension funds and workers' compensation and pneumoconiosis funds formerly invested by this state. The corporation shall be organized as a nonprofit, nonstock corporation under the general corporation laws of the state.

*W.Va.Code,* 44–6B–4(a). The goal of this new corporation is to "act[ ] in all respects for the benefit of the state's public employees and ultimately the citizens of the state[.]" *W.Va.Code,* 44–6B–2(f). It appears that Trust Fund, Inc., is to assume certain "responsibilities and obligations" formerly performed by the State Board of Investments. *W.Va.Code,* 44–6B–9(a).

In creating Trust Fund, Inc., the Legislature declared that an "independent trust fund board" should provide "a stable and continuous source of professional financial investment and management." *W.Va.Code,* 44–6B–2(a). The Legislature provided that "public employee and employer contributions are declared to be an irrevocable trust, available for no use other than for the benefit of those public employees." *W.Va.Code,* 44–6B–2(b). Additionally, the state and other public employers that made or make pension fund contributions "have no proprietary interest in the [West Virginia irrevocable trust] fund or in the contributions made to the fund by them and that the state and other public employers disclaim any right to reclaim those contributions and waive any right of reclamation they may have in the fund[.]" *W.Va.Code,* 44–6B–2(c). However, the Legislature explicitly reserved the right to "amend, modify or alter the terms" of the trust without the consent of Trust Fund, Inc., or any beneficiary. *W.Va.Code,* 44–6B–10(b)(1).

The Act sets out the powers of the new corporation. Trust Fund, Inc., is to have the ability to "[a]cquire (by purchase, gift or otherwise), hold, exchange, pledge, lend and sell or otherwise dispose of securities and invest funds...." *W.Va.Code,* 44–6B–6(7). The corporation can "[e]xercise all powers generally granted to and exercised by the holders of investment securities...." *W.Va.Code,* 44–6B–6(12). Up to sixty percent of the assets held by Trust Fund, Inc., may be placed in corporate stocks. *W.Va.Code,* 44–6B–12(a).

However, the Act limits the types of stock which may be purchased; for instance, no more than five percent of the equity portfolio may be in any one "company or association...." *W.Va.Code,* 44–6B–12(c). Trust Fund, Inc., is to establish and modify its investment objectives within specific legislative constraints. *W.Va.Code,* 44–6B–12(g). There is no provision in the Act for beneficiaries of the pension plans to direct where their money is being invested, nor for direction from employers and workers directly or indirectly affected by the investment of the workers' compensation and coal workers' pneumoconiosis funds.

The Act also imposes duties on the corporation. Trust Fund, Inc., must perform annual financial and compliance audits. Copies of the audit report must be furnished to a host of constitutional and governmental officers, including the governor, state treasurer, state auditor, president of the Senate, speaker of the House of Delegates, the Council of Finance and Administration, and the Consolidated Public Retirement Board. *W.Va.Code,* 44–6B–7(a). The fund must also perform an annual performance audit, and forward copies to the same officers and agencies. *W.Va. Code,* 44–6B–7(d). Trust Fund, Inc., must

also create monthly financial statements, and copies are to be provided to the executive secretary of the state Consolidated Public Retirement Board and the Commissioner of the Bureau of Employment Programs (as head of the Workers' Compensation Division and overseer of the coal workers' pneumoconiosis fund). *W.Va.Code*, 44–6B–7(b). Quarterly reports of investment performance are to be given to the Consolidated Public Retirement Board. "The trust fund shall provide *any other information requested* in writing by the council of finance and administration." *W.Va.Code*, 44–6B–7(e) (emphasis added). The Legislature also has the right to "request and receive additional information from the trustee *at any time.*" *W.Va. Code*, 44–6B–10(b)(2) (emphasis added).

Trust Fund, Inc., is governed by a seven person "board of trustees." Four trustees are appointed by the governor from lists submitted by the president of the Senate, the speaker of the House of Delegates, the auditor, and the treasurer. The remaining three trustees are appointed by the governor, with the advice and consent of the Senate. *W.Va. Code*, 44–6B–4(b). The Act limits the terms of each trustee to five years, and delimits their political affiliations (no more than four trustees may be from the same party). *W.Va.Code*, 44–6B–4(c). The Act allows the governor to unilaterally remove any trustee for "gross negligence or misfeasance," and if he chooses, appoint new trustees to fill any vacancies. *W.Va.Code*, 44–6B–4(e). The Act also sets the salaries for the trustees. *W.Va. Code*, 44–6B–4(f).

The Act establishes a committee system for input and monitoring which requires an individual from each state pension agency and from the workers' compensation and the coal workers' pneumoconiosis funds to be appointed as a representative to Trust Fund, Inc. Before drafting, reviewing or modifying its investment policies, the trustees must meet with representatives of each state pension plan. *W.Va.Code*, 44–6B–4(j). Meetings of the trustees are to be open to members and beneficiaries of each pension plan. Annual meetings of the trustees are to be held, and this meeting must be open to the public. At the annual meeting, the trustees shall accept written and oral comments from the general citizenry. *W.Va.Code*, 44–6B–4(i).

West Virginia Trust Fund, Inc., is to initially consist of five state employee pension funds and two workers' compensation funds: (1) the Public Employees Retirement System, *W.Va.Code*, 5–10–1 to –54; (2) the Teachers Retirement System, *W.Va.Code*, 18–7A–1 to –36; (3) the West Virginia State Police Retirement System, *W.Va.Code*, 15–2A–1 to –19; (4) the Death, Disability, and Retirement Fund of the Department of Public Safety, *W.Va.Code*, 15–2–26 to –39; (5) the Judges Retirement System, *W.Va.Code*, 51–9–1 to –16; (6) the Workers' Compensation Fund, *W.Va.Code*, 23–3–1; and (7) the Coal Workers' Pneumoconiosis Fund, *W.Va. Code*, 23–4B–1 to –8a.

On July 1, 1996, the Governor and State Treasurer were to have delivered the assets in these seven funds to the trustees and Trust Fund, Inc. *W.Va.Code*, 44–6B–10. Additionally, the West Virginia State Board of Investments (a government agency) must transfer certain state property (without any requirement of compensation) to Trust Fund, Inc. "[C]omputers, and other necessary items of equipment" were to be delivered to Trust Fund, Inc., to allow the new corporation to perform duties formerly performed by the Board of Investments. *W.Va.Code*, 44–6B–9(a).

## C.

### *The Present Lawsuits*

The West Virginia Trust Fund Act was effective on March 4, 1996, the date of passage. West Virginia Trust Fund, Inc., was incorporated on May 10, 1996. On July 1, 1996, the State Treasurer was requested to transfer the assets from the five pension plans and two workers' compensation funds to Trust Fund, Inc. That same day, appellee Stanley Klos (a West Virginia citizen) filed a declaratory judgment action against appellee Treasurer Larrie Bailey seeking a declaration that the West Virginia Trust Fund Act was unconstitutional. Six days later, appellee Klos filed a second declaratory judgment action against appellee West Virginia State

Board of Investments and appellant Trust Fund, Inc. Because of this litigation, appellee Bailey refused to transfer pension assets to the appellant. Appellant Trust Fund, Inc., then filed an action petitioning the circuit court for a writ of mandamus to compel the Treasurer to turn over the pension assets. Subsequently, an action seeking a writ of *quo warranto* [6] was filed by the appellee Attorney General alleging that the West Virginia Trust Fund, Inc., had usurped the inherent constitutional authority of the Treasurer.

The circuit court consolidated these four actions. On November 12, 1996, the circuit court ruled that the Act is unconstitutional in its entirety as a violation of *West Virginia Constitution*, Article X, section 6. Further, the court found the Act unconstitutionally invaded the inherent duties of the treasurer and issued a writ of *quo warranto* dissolving West Virginia Trust Fund, Inc., as an illegal corporation. This appeal followed.

## II.

### *Discussion*

#### A.

#### *Standard of Review*

■ The unconstitutionality of a statute must be shown beyond a reasonable doubt. Our standard for reviewing the constitutionality of statutes was set forth in Syllabus Point 1 of *State ex rel. Appalachian Power Company v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965), where we stated:

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of

the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

*See also*, Syllabus Point 1, *State ex rel. Blankenship v. Richardson*, 196 W.Va. 726, 474 S.E.2d 906 (1996); Syllabus Point 1, *Wetzel County Solid Waste Authority v. West Virginia Div. of Natural Resources*, 195 W.Va. 1, 462 S.E.2d 349 (1995); Syllabus Point 4, *Donley v. Bracken*, 192 W.Va. 383, 452 S.E.2d 699 (1994); Syllabus Point 1, *Lewis v. Canaan Valley Resorts, Inc.*, 185 W.Va. 684, 408 S.E.2d 634 (1991); Syllabus Point 4, *State ex rel. W.Va. Housing Development Fund v. Copenhaver*, 153 W.Va. 636, 171 S.E.2d 545 (1969).

■ However, we are substantially less deferential when we examine legislative findings supporting legislation.

Legislative declarations of purpose in enacting law, or making an appropriation, while entitled to respect, will not be treated as conclusive, or as binding on this Court, where, from other facts, conditions and circumstances, appearing on the record, or from facts and events of which we may take judicial notice, it is clear that the real purpose of the legislation or appropriation involved was different from that declared.

Syllabus Point 1, *State ex rel. City of Charleston v. Sims*, 132 W.Va. 826, 54 S.E.2d 729 (1949).

#### B.

#### *Constitutionality of the West Virginia Trust Fund Act*

■ The West Virginia Trust Fund Act states that "employee and employer contributions are declared to be an irrevocable trust, available for no use or purpose other than for the benefit of those public employees." The Act also says that the State has "no proprietary interest" in moneys held by Trust Fund, Inc. The appellant Trust Fund,

---

**6.** The attorney general or a prosecuting attorney may seek a writ of *quo warranto* "against any person who shall intrude into or usurp any public office." *See W.Va.Code*, 53–2–1 to –8. A writ

of *quo warranto* commands a defendant to show the authority under which he is acting, and is intended to prevent the exercise of powers that are not conferred by law.

Inc., argues that these findings are conclusive as a matter of law on the issue of whether the State has a proprietary or fiduciary interest in the funds. We disagree. We do not believe that the conclusory recitals in the Act, or the mechanisms it establishes, can or do operate to eliminate the State's proprietary and fiduciary interest in the funds.

The Act relies on the establishment of a non-stock, non-profit public corporation to achieve its purposes. That corporation, appellant Trust Fund, Inc., contends that its existence is separate and independent of the State. On the contrary, we conclude that Trust Fund, Inc., is in a symbiotic and interdependent relationship with the State.

In *Queen v. West Virginia University Hospitals, Inc.*, 179 W.Va. 95, 365 S.E.2d 375 (1987), we considered a similar argument. We examined statutes creating a university hospital corporation to determine if the corporation was a private or state actor for purposes of constitutional due process and the applicability of the state Freedom of Information Act.[7] We stated that in such cases we would "evaluate the nature and extent of state involvement" to determine if an entity is a state actor, and if the entity's actions are fairly attributable to the state. 179 W.Va. at 103, 365 S.E.2d at 383.

We found in *Queen* that West Virginia University Hospitals, Inc.'s corporate existence was created by the Legislature. The hospital argued that it was created under our general corporate law; we disagreed stating:

> The appellant's argument asks us to ignore the reality of the circumstances surrounding the creation of WVUH in favor of stilted formalism. The passage of § 18–11C–1 *et seq.* made possible the development of WVUH, and no contention is made that WVUH would ever have been incorporated were it not for the enabling statute.

179 W.Va. at 102, 365 S.E.2d at 382. We also found that West Virginia Hospitals, Inc., was created for state purposes such as providing medical education. We noted statutory requirements that annual audit records of West Virginia University Hospitals, Inc., be pro-

vided to the Legislature. Seven of the nine directors of the hospital corporation were appointed by the governor, subject to confirmation by the Senate. 179 W.Va. at 99, 365 S.E.2d at 379. Our review of the statutorily specified purposes indicated that the directors "have fiduciary duties to the people of the State of West Virginia." *Id.* Taken together, it was clear that "the Legislature intended that WVUH remain accountable as a fiduciary to the people of West Virginia," 179 W.Va. at 102, 365 S.E.2d at 382, and that a "symbiotic relationship" existed between the State and West Virginia University Hospitals, Inc. 179 W.Va. at 104, 365 S.E.2d at 384. Accordingly, in *Queen* we held the university hospital corporation to be subject to constitutional due process requirements and the Freedom of Information Act.

We can properly apply to Trust Fund, Inc., the same sort of analysis we applied in *Queen*. To determine if an entity is a state actor subject to constitutional duties or restrictions, the nature and extent of state involvement must be evaluated so as to determine if its actions are fairly attributable to the state. It is clear that the Legislature similarly (and, we think, necessarily) intended that Trust Fund, Inc., remain accountable to the people of West Virginia. Similar to our holding in *Queen*, we believe that West Virginia Trust Fund, Inc., is likewise in such an interdependent relationship with the State such that it is subject to the absolute constitutional restriction against investing in corporations or associations.

Trust Fund, Inc., would not have been incorporated were it not for the enabling statute, *W.Va.Code*, 44–6B–4. It was to begin its corporate life using property, equipment, and funds transferred from the Board of Investments. It was to use this equipment and property to assume the duties of the Board of Investments. *W.Va.Code*, 44–6B–9. The public purpose of Trust Fund, Inc., is specifically stated in the legislative findings, which declare that Trust Fund, Inc., must act "in all respects for the benefit of the state's public employees *and ultimately the citizens of the state*." *W.Va.Code*, 44–6B–2(f) (emphasis added). Moreover, a principal

---

7. *W.Va.Code*, 29B–1–1 to –7.

purpose in creating Trust Fund, Inc., is to benefit the public fisc by reducing the need for legislative appropriations to fund pension plans.

Continuing with our review, Trust Fund, Inc., is accountable to both the general public and individual government officers. This is apparent in the requirements that financial and performance audits routinely be prepared and provided to numerous constitutional and other government officials, and that representatives of each pension and workers' compensation fund be advised prior to alterations in investment strategies. And, Trust Fund, Inc., must accept written and oral public comments at its annual meetings. This is a standard requirement for government agencies, not private corporations.

Each of Trust Fund, Inc.'s seven trustees is appointed by the governor. One trustee is chosen from each of four lists prepared by the treasurer, auditor, speaker of the House of Delegates, and president of the Senate. The remaining three are appointed by the governor alone, with the advice and consent of the Senate. These trustees can all be removed by the governor if he alone determines they have acted with "gross negligence or misfeasance." The governor may appoint persons to fill vacancies if he chooses. The Act specifies that a key factor that guides the governor's choice of trustee candidates is not the candidates' financial or investment acu-

men, but their political affiliation. The base salaries of the trustees are set by the Legislature, not Trust Fund, Inc.

Trust Fund, Inc., owes substantial fiduciary duties to the people of West Virginia. The trustees are charged by law to act with the highest standard of care, skill, prudence and diligence,[8] *W.Va.Code*, 44–6B–11, to benefit both state employees *and* the citizens of West Virginia. *W.Va.Code*, 44–6B–2(f). On the one hand, while representatives from state agencies must participate in meetings of the trustees, and the public and government agents are allowed to provide input to the trust fund, Trust Fund, Inc., is not bound to follow that input. *W.Va.Code*, 44–6B–4(g)–(*l*). On the other hand, the governor may remove trustees for what he perceives to be misconduct. *W.Va.Code*, 44–6B–4(e). Meanwhile, the Legislature retains the ability to amend, modify or alter the terms of the trust as it sees fit, without the consent or input of Trust Fund, Inc., and the beneficiaries. *W.Va.Code*, 44–6B–10(b)(1). Thus, the beneficiaries of the trust (public employees and the citizens of West Virginia) cannot directly control Trust Fund, Inc.'s investment of what is stated to be the employees' money.

The State continues to be responsible to public employees and others for moneys held by Trust Fund, Inc., in its pension and workers' compensation funds.[9] As we stated in

---

**8.** One of the issues raised by the parties is constitutionality of the standard of care which must be exercised by Trust Fund, Inc., in its management of state funds, and whether it impairs the contract rights of state employees. We do not address this issue, as we believe the Act is unconstitutional for other reasons.

**9.** Recently, the State of Louisiana was dismissed from a lawsuit against stock market operators who allegedly conspired to manipulate price quotes on the NASDAQ stock market. The federal district court ruled that because Louisiana does not have any interest in state employee retirement funds, losses by those pension funds could not be recovered by the State. The district court ruled that only the individual pension funds were authorized to assert claims for damages. *In re NASDAQ Market–Makers Antitrust Litigation,* 169 F.R.D. 493, 506–508 (S.D.N.Y. 1996).

A similar result occurred in a lawsuit filed by the Oregon Industrial Accident Insurance Fund against former directors of the Oregon workers'

compensation system. It appears that these directors had misallocated workers' compensation funds, and the Industrial Accident Fund sued under a statute providing "for potential recovery from public officers for the loss 'public funds' with which they are entrusted." The lawsuit was dismissed, partly because Oregon explicitly "has no proprietary interest" in the Industrial Accident Fund; hence, the moneys lost were not "public funds" within the meaning of the statute. *State By and Through State Accident Insurance Fund Corp. v. Montgomery,* 108 Or.App. 93, 99, 814 P.2d 536, 539 (1991), *review denied sub nom., SAIF Corp. v. Montgomery,* 312 Or. 589, 824 P.2d 418 (1992).

We cannot believe that the Legislature intended to deprive the State of any opportunity to recover for losses incurred due to third-party misconduct on the stock market, or for the misappropriation of the Workers' Compensation Fund. If we were to accept the appellant's arguments, under the system currently created by the West Virginia Trust Fund Act the trustees could decline to press a lawsuit to recover damages

*Dadisman, supra,* a trust relationship continues to exist, and the State continues to have a beneficial interest in the money, regardless of the Act's declaration that the State has no proprietary interest. If the investment in corporate equities fails to provide a return, the taxpayers will be required to reimburse pension plans.[10]

Thus, when we apply to Trust Fund, Inc., the same type of factual review we applied in *Queen,* we find the same fiduciary and symbiotic relationship that made West Virginia University Hospitals, Inc., a state actor for due process purposes and subject to the Freedom of Information Act. Accordingly, we find that West Virginia Trust Fund, Inc., is a state actor and an instrumentality of the State and is subject to the *West Virginia Constitution,* Article X, section 6 prohibition against the investment of state moneys towards becoming a joint owner or stockholder in any company or association. Additionally, we find that the funds to be transferred to Trust Fund, Inc., because of the State's fiduciary interest in the funds are subject to the constitutional restriction.

In reaching this conclusion, we expressly do not address appellant Trust Fund, Inc.'s position that diversified investments are an effective means of increasing the return on pension moneys. We acknowledged in *Gainer* that "investments in the stock market would likely produce a greater return over the long term for the consolidated fund, if prudently invested, than is currently being realized." 194 W.Va. at 150, 459 S.E.2d at

538. We recognize that, subject to constitutional limits, how to spend, protect and preserve State moneys is a choice generally ascribed to the domain of the Legislature.

More than once we have observed that *West Virginia Constitution,* Article X, section 6 was originally enacted to prevent the State from following in the footsteps of pre-Civil War Virginia and incurring a massive debt to corporations.

> As is well known, the mother Commonwealth of Virginia incurred a large and burdensome debt, largely through the granting of aid, and the extension of credit to counties, municipalities and private corporations, in encouraging various enterprises, particularly the construction of railroads, turnpikes, bridges, and other permanent works, designed to be of value to the general public. The recollection of the result of this mistaken policy on the part of Virginia was fresh in the minds of those who, in 1872, met to frame a new Constitution for this State. They attempted to set up guards against the repetition, by this State, of the policy which had brought so much grief to Virginia and its people, [by enacting Article X, section 6]
> . . .

*State ex rel. City of Charleston v. Sims,* 132 W.Va. 826, 839–840, 54 S.E.2d 729, 737 (1949). The appellant and *amici* cogently argue that the specific historical circumstances surrounding the enactment of the 1863 and 1872 constitutions no longer exist,

---

caused by such misconduct. The Legislature would then have to appropriate moneys from the general revenue fund to replace these losses, yet would not be able to recover the losses directly from the wrongdoer.

**10.** Because the parties have not briefed this issue, we are less clear on what the result would be on the workers' compensation fund and the coal workers' pneumoconiosis fund. The workers' compensation fund is paid entirely by premiums levied on employers, while the coal workers' pneumoconiosis fund is collected as a voluntary tax on coal.

The appellant argues that the Workers' Compensation Fund involves only two parties: employers that pay premiums, and injured workers entitled to benefits for employment-related injuries. However, there is a third party involved in the workers' compensation system: the state

workers who are employed in the Workers' Compensation Division of the Bureau of Employment Programs. All salaries and expenses of these public employees are paid, not from the general revenue fund, but from the Workers' Compensation Fund. Additionally, all expenses attendant to operating the Fund are paid from the Fund. *W.Va.Code,* 23–1–2 [1991]. We cannot accept the Act's premise that the State has no interest in the Workers' Compensation Fund, when that Fund is simultaneously being used to pay the salaries of state employees of the Workers' Compensation Division.

Additionally, such things as rent for buildings is paid by the Fund. If Trust Fund, Inc., were to sustain substantial losses in the stock market, the Workers' Compensation Division may not only be unable to pay injured claimants and its state employees' salaries, but may be unable to pay rent for office space. Such a default would clearly impair the State's credit.

and that Article X, section 6 is therefore inapplicable. But we rejected this argument in *Gainer*, and we adhere to the position that the times have not changed so much that we are permitted to abandon plain constitutional language.[11]

 The clear language of *West Virginia Constitution*, Article X, section 6, itself stands as a bar to state ownership of corporate stocks. Article X, section 6 is written as an unconditional proscription of any investment by the State towards becoming a joint owner or stockholder in any company or association. *Gainer*, 194 W.Va. at 149, 459 S.E.2d at 538 (1995). " 'Where a provision of a constitution is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it should be applied and not construed.' Syl. Pt. 3, *State ex rel. Smith v. Gore*, 150 W.Va. 71, 143 S.E.2d 791 (1965)." Syllabus Point 1, *Gainer*. Since Trust Fund, Inc., is acting as a state instrumentality we conclude beyond a reasonable doubt that it is unconstitutional for the corporation to invest state employees' pension or workers' compensation funds in corporate equities.

In *Dadisman* we ruled that the statutes creating pension plans also created a fiduciary duty in the State to protect those funds. *Gainer* ruled that the attempt by the State Board of Investments to directly invest those state funds in corporate equities was unconstitutional. Here, we face an artful attempt by the Legislature to create an alter ego of the State, and to use that alter ego to indirectly invest state moneys in corporate stock.

We spoke to similar indirect methods of allocating the public treasury (methods which implicated the *West Virginia Constitution*, Article X, section 6 restrictions) in *Berry v.*

*Fox*, 114 W.Va. 513, 519, 172 S.E. 896, 899 (1934) when we stated:

Unless plain and simple words have lost their meaning, section 6 of article 10 of our present Constitution prohibits the legislature from granting the credit of the state or assuming debts and liabilities such as are in said section indicated, whether such assumption be done directly and unequivocally or by indirection.

Our holding today is the same: circumvention or indirection are not permissible methods for avoiding the substantive meaning of plain words in the constitution.

By simply declaring that the State has no ownership in the funds in question, the Legislature does not thereby immunize an act from scrutiny under Article X, section 6 of the *Constitution*. Our inquiry does not end with the Legislature's declaration of purpose. A statute which appears at first blush to satisfy a constitutional prohibition must be examined in its entirety to determine if its actual function is violative of the *Constitution*.

 We conclude that the State cannot by circumvention or indirection avoid the meaning of plain words in the *Constitution*; therefore, the language in the legislative declarations in *W.Va.Code*, 44–6B–2, which provide that the "state and other public employers ... have no proprietary interest" in state pension and workers' compensation funds are insufficient to avoid the clear language and meaning of *West Virginia Constitution*, Article X, section 6. We find that West Virginia Trust Fund, Inc., was established to act in the shadow of the State, to do indirectly what the State cannot do directly. This is not constitutionally permissible.[12]

---

11. An argument that abandonment of a constitutional provision is "necessary" is also addressed in the *Constitution*. Article I, section 3 states that the provisions of the *Constitution* are always operative, "and any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good government...."

12. Our State's founders may have anticipated the current situation. On February 3, 1862, in the lengthy constitutional convention debate over the investment and debt limitations, Delegate Henry

Dering, a dry goods merchant from Monongalia County, stated:

We put this restriction in the Constitution for the present, until we get able to dispense with it. Then if the people want this system they can ask the legislature for an amendment to the Constitution. When we get the ability to do it, we will do it. But we don't go for bonding the credit of the State in advance. We have not yet got an existence as a state; yet the gentleman before we are born proposes to publish an invitation in our Constitution to shark companies from abroad to come in and

## C.

### Severability of Statutory Provisions

The appellant argues that the circuit court improperly declared the entire West Virginia Trust Fund Act unconstitutional. The appellant argues that we should use the least intrusive remedy and sever any provisions of the Act which we find to be unconstitutional and void. *W.Va.Code,* 2-2-10(cc) [1989] provides:

> Unless there is a provision in a section, article or chapter of this code specifying that the provisions thereof shall not be severable, the provisions of every section, article or chapter of this code, whether enacted before or subsequent to the effective date of this subdivision, shall be severable so that if any provision of any such section, article or chapter is held to be unconstitutional or void, the remaining provisions of such section, article or chapter shall remain valid, unless the court finds the valid provisions are so essentially and inseparably connected with, and so dependent upon, the unconstitutional or void provision that the court cannot presume the Legislature would have enacted the remaining valid provisions without the unconstitutional or void one, or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent[.]

■■■ We agree with the abstract principle that there may conceivably be investments that could constitutionally be made by Trust Fund, Inc. However, appellant Trust Fund, Inc., fails to identify which specific

statutory provisions could be cleanly severed from the Act, and we decline to assume a legislative role, rummaging through the entire Act, patching together sentences which we feel would reach a constitutional result. Further, the entire Act was introduced and passed by the Legislature to permit the indirect investment of state moneys in corporate equities, and we cannot conceive how to separate this unconstitutional goal from the Act. Accordingly, we find that the West Virginia Trust Fund Act, *W.Va.Code,* 44-6B-1 to -12 [1996], is unconstitutional as it violates the unconditional constitutional proscription against the State becoming a joint owner or stockholder in any corporation or association.

## D.

### Duties of the State Treasurer

■■■ The appellee Attorney General contends that the West Virginia Trust Fund Act has impermissibly altered the core functions and duties inherent in the constitutional executive office of state treasurer. The Attorney General argues that "certain core functions" are implicit in the constitutionally designated title of the office, and West Virginia Trust Fund, Inc., is interfering with these functions by managing the pension and workers' compensation funds. The appellant Trust Fund, Inc., argues that the treasurer has no inherent duties and has only those powers which are granted by the Legislature. We decline at this point to venture deeply into this quagmire of divining "core functions." We simply hold that we find no inherent duties of the state treasurer which are affected by the West Virginia Trust Fund Act.

---

prey on our infant credit. Let us wait until we get to be a state and then it will be time to feed these corporations. In the name of consistency, I call upon this Convention to stand fast and vote against striking out this safe-guard. 3 *Debates and Proceedings of the First West Virginia Constitutional Convention (1861–1863),* at 234. This selection from our constitutional history strongly suggests that amendment of the constitution is required to eliminate the substantive bar to investment in the stock market.

The *Debates and Proceedings* are an invaluable resource for understanding our constitutional history. The debates cover three volumes containing thousands of pages of fascinating rhetoric. For these debates we are indebted to

Granville D. Hall, a clerk who took extensive stenographic notes of the Convention. The Convention never authorized publication of its proceedings. Hall moved to Chicago in later years and took with him his notes. In 1906, during the course of a lawsuit with Virginia over allocation of pre-War debts, the West Virginia governor learned of the notes and paid Hall to transcribe them. The transcription did not prove useful, and the notes were placed in the State Archive. In 1942, the debates were finally assembled and printed under the direction of this Court. *See* Thomas W. Rodd, "Tracing West Virginia's Constitution," *W. Va. Public Interest Law Rpt.,* Summer 1982, p. 15 n. 52.

The office of treasurer, along with the other elective offices of the executive department, is established by *West Virginia Constitution*, Article VII, section 1. That provision states, in pertinent part:

> The executive department shall consist of a governor, secretary of state, auditor, treasurer, commissioner of agriculture and attorney general, who shall be, ex officio, reporter of the court of appeals.... They ... shall perform such duties as may be prescribed by law.

In our seminal decision of *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909 (1982), we analyzed the powers that Article VII, section 1 granted to the attorney general. We concluded that the plain language of this constitutional provision failed to confer common law powers on the attorney general such as those found in England and British North America during the colonial period. "The powers and duties of the Attorney General are specified by the constitution and by rules of law prescribed pursuant thereto." Syllabus Point 1, *Manchin, supra.*

We revisited this holding in *State ex rel. Fahlgren Martin, Inc. v. McGraw*, 190 W.Va. 306, 438 S.E.2d 338 (1993), where the Attorney General argued that his oath of office and the *Constitution* required that he halt any contract which he believed to be illegal and investigate any wrongful acts inherent in the contract. After reviewing the *Constitution* and all applicable statutes, we found the office of attorney general had no inherent powers to review state contracts beyond those granted by the Legislature. We concluded:

> The West Virginia Constitution and W.Va.Code § 5A–3–13 (1993) grant the Attorney General the duty to approve a contract as to form only.... The Attorney General cannot hold a contract in his office awaiting the outcome of a trial, investigation or other proceedings. The Attorney General has no investigative powers in connection with the contract. He cannot sue on the contract on behalf of the State unless otherwise authorized by statute.

Syllabus Point 3, in part, *Fahlgren Martin, supra.*

We believe the same rationale applies in the instant case. The appellees have not directed us to any relevant authorities that would suggest the state treasurer has any "inherent" duties beyond those specifically spelled out in the *Constitution*,[13] and certainly no duties impaired by the Act. Our review of the constitutional debates surrounding the formation of the executive branch and the office of treasurer supports the conclusion that our founders intended for the Legislature to define most of the responsibilities of the office.[14]

---

13. For example, *West Virginia Constitution*, Article VII, section 17, mandates that the treasurer and other officers:

> shall keep an account of all moneys received or disbursed by them, respectively, and from all sources and for every service performed, and make a semiannual report thereof to the governor under oath or affirmation; ...

Another duty of the treasurer is found in Article XII, section four, which establishes the Invested School Fund. This provision states, in pertinent part, that certain moneys:

> shall be set apart as a separate fund, to be called the "school fund," and invested under such regulations as may be prescribed by law, in the interest-bearing securities of the United States, or of this State, or if such interest-bearing securities cannot be obtained, then said "school fund" shall be invested in such other solvent, interest-bearing securities as shall be approved by the governor, superintendent of free schools, auditor and treasurer, who are hereby constituted the "board of the school fund," to manage the same under such regulations as may be prescribed by law; ...

14. The 1861–1863 debates focused primarily on whether the salaries of the auditor, treasurer, and secretary of state should be established in the *Constitution*, or left to the Legislature. The following excerpts suggest that the founders preferred to give the Legislature the power to define the duties of each office:

> MR. VAN WINKLE. I would suggest that in fixing the compensation of these offices we ought to define their duties. This section provides that the compensation and duties shall be prescribed by the legislature.
>
> MR. BROWN of Kanawha. I am in the dark. I do not know what are the labors and duties of these officers though I have had some intercourse with them.... I confess myself a good deal in the fog what to do about it.
>
> MR STEVENSON of Wood.... I suppose the duties of this officer will be something such as are performed in other states....
>
> MR. STUART of Doddridge. I presume the duties of the treasurer, auditor and secretary will be very much the same as at present, and I am very much opposed to these sliding sala-

The powers and duties of the state treasurer are only as specified by the *Constitution* and by rules of law prescribed pursuant thereto. We find nothing repugnant to this principle in the West Virginia Trust Fund Act.

### IV.

### *Conclusion*

We affirm the circuit court's ruling declaring the West Virginia Trust Fund Act, *W.Va. Code,* 44–6B–1 to –12 [1996], unconstitutional. However, we hold that the Act does not interfere with any duties of the treasurer, as the powers and duties of the treasurer are only as specified by the Constitution and statutes prescribed by the Legislature.

Affirmed in part; reversed in part.

MAYNARD, J., files a dissenting opinion.

### APPENDIX

**§ 44–6B–1. How article cited**

This article shall be known and may be cited as the "West Virginia Trust Fund Act".

**§ 44–6B–2. Legislative findings and purpose**

(a) The Legislature hereby finds and declares that all the public employees covered by the public employees retirement system, the teachers retirement system, the West Virginia state police retirement system, the death disability and retirement fund of the division of public safety and the judges' retirement system should benefit from a prudent and conscientious staff of financial professionals dedicated to the administration, investment and management of those employees' and employer's financial contributions and that an independent trust fund board and staff should be immune to changing political climates and should provide a stable and continuous source of professional financial investment and management.

(b) The Legislature hereby finds and declares further that experience has demonstrated that prudent investment provides diversification and beneficial return not only for public employees but for all citizens of the state and that in order to have access to this sound fiscal policy, public employee and employer contributions are declared to be an irrevocable trust, available for no use or purpose other than for the benefit of those public employees.

(c) The Legislature hereby finds and declares further that the state and other public employers that made or make contributions to the West Virginia irrevocable trust fund have no proprietary interest in the fund or in the contributions made to the fund by them and that the state and other public employers disclaim any right to reclaim those contributions and waive any right of reclamation they may have in the fund: *Provided,* That the provisions of this subsection do not pro-

---

ries.... I want to place this thing entirely out of the reach of the legislature, and let us fix the compensation....

Mr. Battelle. There is force in the suggestion since it has been made that we are rather going it blind here. I do not know, for one, what a secretary of state is expected to do under the new Constitution; ... and until we are informed from some source either by writing it down in the Constitution or by some other accredited authority what he is to do, I am not prepared to say what we ought to do. I would like to hear from gentlemen learned in these matters....

Mr. Van Winkle.... I think we are getting in the dark attempting to fix salaries of officers whose duties we do not know and giving it in the power of the legislature to change those duties without any power over the salaries. I suggest if it would not be a considerable saving of time to strike out the word "compensation" and leave that to the legislature....

Mr. Battelle.... I do not know what these officers are to receive, for I do not know what they are to do and I suppose we cannot know until the legislature defines their duties....

Mr Smith.... You hear gentlemen get up on all sides and ask what are the duties of these officers, and not one of them can tell you. They do not know the duties that they have to perform ... Now, if so enlightened a body as this Convention shall be in such straits as is shown here to ascertain what the duties are I should like to know how you can call upon a people to vote for them ... Let the selection and the fixing of compensation rest with the legislature, who will know what their duties are ...

3 *Debates and Proceedings of the West Virginia Constitutional Convention (1861–1863)* at 334–343.

hibit alterations or refunds of employer contributions in the event of erroneous payment.

(d) The Legislature hereby finds and declares further that the workers' compensation funds and coal-workers' pneumoconiosis fund are trust funds to be used exclusively for those workers, miners and their beneficiaries who have sacrificed their health in the performance of their jobs, and further finds that the assets available to pay awarded benefits should be prudently invested so that awards may be paid.

(e) The Legislature hereby finds and declares further that a not-for-profit, nonstock corporate structure with appropriate governance shall be the best means of assuring prudent financial management of this nonstate trust fund under rapidly changing market conditions and regulations.

(f) The Legislature hereby finds and declares further that in accomplishing this purpose, the West Virginia trust fund, created and established by section four of this article, is acting in all respects for the benefit of the state's public employees and ultimately the citizens of the state, and the West Virginia trust fund is empowered by this article to act as trustee for the irrevocable trust created by this article, and the interests of citizens of the state shall be best met by carrying out the provisions of this trust.

(g) The Legislature hereby finds and declares further that the standard of care and prudence applied to trustees and the conduct of the affairs of the irrevocable trust created by this article is intended to be that applied to the administration of private pension plans as described in federal statutory law and by the common law of the United States.

§ 44–6B–3. Definitions

As used in this article unless a different meaning clearly appears from the context:

(a) "Beneficiaries" means those individuals entitled to benefits from the consolidated pension plan;

(b) "Board" means the governing body for the West Virginia trust fund;

(c) "Consolidated pension plan" means the public employees retirement system estab-

lished in article ten, chapter five of this code, the teachers retirement system established in article seven-a, chapter eighteen of this code, the West Virginia state police retirement system established in article two-a, chapter fifteen of this code, the death, disability and retirement fund of the department of public safety established in article two, chapter fifteen of this code, the judges' retirement system established in article nine, chapter fifty-one of this code, the workers' compensation fund established in article three, chapter twenty-three and the coal-workers' pneumoconiosis plan established in article four-b, chapter twenty-three of this code;

(d) "Participant plan" means any component system, plan or fund of the consolidated pension plan within the definition set forth in subdivision (c) of this section;

(e) "Political subdivision" means and includes a county, municipality or any agency, authority, board, county board of education, commission or instrumentality of a county or municipality and regional councils created pursuant to the provisions of section five, article twenty-five, chapter eight of this code;

(f) "State" means the state of West Virginia;

(g) "Trust fund" means the West Virginia trust fund; and

(h) "Trustee" means any member serving on the West Virginia trust fund board: *Provided*, That in section ten of this article wherein the terms of the trust indenture are set forth, "trustee" means the West Virginia trust fund.

§ 44–6B–4. West Virginia trust fund created; body corporate; board created; trustees; nomination and appointment of trustees, qualifications and terms of appointment, advice and consent; annual and other meetings; designation of representatives and committees; board meetings with committees regarding investment policy statement required; open meetings, qualifications

(a) There is hereby created the West Virginia trust fund. The fund is created as a public body corporate and established to provide prudent fiscal administration, invest-

ment and management for the pension funds and workers' compensation and pneumoconiosis funds formerly invested by this state. The corporation shall be organized as a nonprofit, nonstock corporation under the general corporation laws of the state.

(b) The trust fund shall be governed by a board of trustees, consisting of seven members:

(1) Four members shall be appointed by the governor from a list of twelve persons having experience in pension management, institutional management or financial markets. The list of twelve shall consist of four groups of three nominations, and no more than two of the three nominations in each group may be from the same political party. The president of the Senate, speaker of the House of Delegates, state auditor and state treasurer each shall submit one group of three nominations to the governor, who shall appoint one member from each group of three, which appointments shall be subject to the advice and consent of the Senate.

(2) The remaining three members shall be appointed from the general public by the governor, which appointments shall be subject to the advice and consent of the Senate. Of the members of the general public appointed by the governor, one shall be an attorney experienced in finance and investment matters, one shall be a certified public accountant and one shall be experienced in pension management, institutional management or financial markets.

(3) The governor shall make appointments to the trust fund board within sixty days of the effective date of this act. Nominations for the appointments shall be submitted to the governor within thirty days of the effective date of this act.

(4) Any appointment made by the governor subject to the advice and consent of the Senate is effective immediately upon appointment by the governor with respect to voting, constituting a quorum, receiving compensation and expenses, and all other rights and privileges of the trustee position.

(c) Two members shall serve for a term of three years, two members for a term of four years and three members for a term of five years respectively as the governor shall designate. Thereafter, at the end of each term, the governor may reappoint or appoint a successor following the same procedure as specified in subsection (b) of this section, who shall serve for five-year terms. No more than four of the trustees may belong to the same political party.

(d) In the event of a vacancy among the trustees, an appointment shall be made by the governor to fill the unexpired term. The governor shall fill the vacancy, by appointment from a new list of nominees, following the same procedure established in subsection (b) of this section.

(e) The governor may remove any trustee in case of gross negligence or misfeasance and may declare that position vacant and may appoint a person for the vacancy as provided in subsection (d) of this section.

(f) Each trustee shall be entitled to receive, and, at the trustee's option, the board shall pay to the trustee, compensation in the amount of five thousand dollars per year and additional compensation in the amount of five hundred dollars per meeting attended by the trustee in excess of the four quarterly meetings required by this section. In addition, trustees shall receive reasonable and necessary expenses actually incurred in discharging trustee duties pursuant to this article.

(g) The board shall meet quarterly and may include in its bylaws procedures for the calling and holding of additional meetings. For any quarterly or additional meeting in which the board shall review or modify its securities list or its investment objectives pursuant to subsection (f), section twelve of this article, the board shall give ten days' notice in writing to the designated representative of each participant plan selected pursuant to subdivision (1), subsection (j) of this section, and the meeting shall be open to the members and beneficiaries of the participant plans for that portion of the meeting in which the board undertakes the review or modification.

(h) The West Virginia trust fund board shall meet prior to the first day of July, one thousand nine hundred ninety-six, to organize and structure its operations.

(i) The board shall hold an annual meeting within forty-five days after the issuance of the year-end financial report. The annual meeting may also serve as a quarterly meeting. The annual meeting shall be open to the public, and the board shall receive oral and written comments from representatives, members and beneficiaries of the participant plans and from other citizens of the state. At the annual meeting, the board shall adopt a fee schedule and a budget reflecting fee structures for the year.

(j) Pursuant to subsection (k) of this section, the board shall meet with committees representing the participant plans to discuss the board's drafting, reviewing or modifying the written investment policy of the trust with respect to that committee's participant plan pursuant to section twelve of this article. Representatives and committees shall be designated as follows:

(1) On or before the first day of May, one thousand nine hundred ninety-six, the West Virginia consolidated public retirement board shall promulgate procedural rules by which each pension system named in paragraphs one through five, subdivision (c), section ten of this article, shall designate an individual representative of each said pension system, and the West Virginia workers' compensation commission shall promulgate procedural rules by which the pneumoconiosis fund and the workers' compensation fund named in paragraphs six and seven, subdivision (c), section ten of this article, shall designate an individual representative of each said fund.

(2) On or before the first day of June, one thousand nine hundred ninety-six, and on or before the same date each year thereafter, the consolidated public retirement board shall submit in writing to the West Virginia trust fund board the names of the five designated representatives, and the workers' compensation commission shall so submit the names of the two representatives.

(3) Each designated representative shall provide to the West Virginia trust fund board his or her current address, updated each year on or before the first day of July, to which address the board shall provide notice of meetings of the board pursuant to subsection (g) of this section.

(4) Each designated representative shall submit in writing to the board on or before the first day of July, one thousand nine hundred ninety-six, and on or before the same date each year thereafter, the names of no more than three persons comprising a committee representing the beneficiaries of that representative's participant plan.

(k) At its initial meeting, and thereafter at its annual meeting, the board shall meet with each of the seven committees, formed pursuant to subsection (j) of this section, for the purpose of receiving input from the committees regarding the board's drafting, reviewing or modifying its written investment policy statement for the trust. In developing the trust investment policy statement, the trustees shall receive each committee's stated objectives and policies regarding the risk tolerances and return expectations of each participant plan, with attention to the factors enumerated in subsection (g), section twelve of this article, in order to provide for the continuing financial security of the trust and its participant plans. The board may meet with the said committees or any of them at its quarterly and additional meetings for the same purpose.

(l) All meetings of the board shall be open to the representatives of the participant plans as appointed pursuant to subsection (j) of this section. The representatives shall be subject to any rules, bylaws, guidelines, requirements, and standards promulgated by the board. The representatives shall observe standards of decorum established by the board. The representatives shall be subject to the same code of conduct applicable to the trustees and shall be subject to all trust fund rules and bylaws. The representatives shall also be subject to any requirements of confidentiality applicable to the trustees. Each representative shall be liable for any act which he or she undertakes which violates any rule, bylaw, or statute governing

ethical standards, confidentiality, or other standard of conduct imposed upon the trustees or the representatives. Any meeting of the board may be closed, upon adoption of a motion by any trustee, when necessary to preserve the attorney-client privilege, to protect the privacy interests of individuals, to review personnel matters, or to maintain confidentiality when confidentiality is in the best interest of the beneficiaries of the trust.

## § 44–6B–5. Management and control of fund; officers; staff; fiduciary or surety bonds for trustees; liability of trustees

(a) The management and control of the fund shall be vested solely in the board of trustees in accordance with the provisions of this article.

(b) The board of trustees shall elect a chairman to serve for a term of two years. The election shall be held at the board's first meeting after the effective date of this article. Effective with any vacancy in the chairmanship, the board shall elect a chairman to a new two-year term. Annually, beginning with the first meeting, the trustees shall elect a secretary, who need not be a member of the board, to keep a record of the proceedings of the board.

(c) The trustees shall appoint a chief executive officer of the trust fund and shall fix his or her duties and compensation. The chief executive officer shall have five years' experience in investment management with public or private funds within the ten years next preceding the date of appointment. The chief executive officer additionally shall have academic degrees, professional designations and other investment management or investment oversight or institutional investment experience in such combination as the trustees consider necessary to carry out the responsibilities of the chief executive officer position as defined by the trustees.

(d) The trustees shall retain an internal auditor to report directly to the trustees and shall fix his or her compensation. The internal auditor shall be a certified public accountant with at least three years' experience as an auditor. The internal auditor shall develop an internal audit plan, with board approval, for the testing of procedures and the security of transactions.

(e) Each trustee shall give a separate fiduciary or surety bond from a surety company qualified to do business within this state in a penalty amount of one million dollars for the faithful performance of his or her duties as a trustee of the fund. The board shall purchase a blanket bond for the faithful performance of its duties, in the amount of fifty million dollars or in an amount equivalent to one percent of the assets under management, whichever is greater. The amount of the blanket bond shall be in addition to the one million dollar individual bond required of each trustee by the provisions of this section. The board may require a fiduciary or surety bond from a surety company qualified to do business in this state for any person who has charge of, or access to, any securities, funds or other moneys held by the board, and the amount of the fiduciary or surety bond shall be fixed by the board. The premiums payable on all fiduciary or surety bonds shall be an expense of the board.

(f) The trustees and employees of the West Virginia trust fund are not liable personally, either jointly or severally, for any debt or obligation created by the West Virginia trust fund: *Provided,* That the trustees and employees of the West Virginia trust fund are liable for acts of misfeasance or gross negligence.

## § 44–6B–6. Corporate powers

The fund may exercise all powers necessary or appropriate to carry out and effectuate its corporate purposes. The fund may:

(1) Adopt and use a common seal and alter the same at pleasure;

(2) Sue;

(3) Enter into contracts and execute and deliver instruments;

(4) Acquire (by purchase, gift or otherwise), hold, use and dispose of real and personal property, deeds, mortgages and other instruments;

(5) Promulgate and enforce bylaws and rules for the management and conduct of its affairs;

(6) Retain and employ legal, accounting, financial and investment advisors, managers and consultants;

(7) Acquire (by purchase, gift or otherwise), hold, exchange, pledge, lend and sell or otherwise dispose of securities and invest funds;

(8) Maintain accounts with banks, securities dealers and financial institutions both within and outside this state;

(9) Consolidate and manage moneys, securities and other assets of the pension plans and other funds and accounts of the state and the moneys of political subdivisions which may be made available to it under the provisions of this article;

(10) Enter into agreements with political subdivisions of the state whereby moneys of the political subdivisions are invested on their behalf by the fund;

(11) Charge and collect administrative investment and management fees for its services;

(12) Exercise all powers generally granted to and exercised by the holders of investment securities with respect to management of the securities;

(13) Make, and from time to time, amend and repeal bylaws, regulations and procedures not inconsistent with the provisions of this article;

(14) Hire its own employees, consultants, managers and advisors as it considers necessary, and fix their compensation and prescribe their duties;

(15) Develop, implement and maintain its own banking accounts, investments and employee benefit plans;

(16) Borrow or open lines of credit; and

(17) Do all things necessary to implement and operate the trust fund and carry out the intent of this article.

**§ 44–6B–7. Annual audits; reports and information to constitutional and legislative officers, council of finance and administration, consolidated public retirement board, workers' compensation fund, and coal-workers' pneumoconiosis fund; statements and reports open for inspection**

(a) The trust fund shall cause an annual financial and compliance audit to be made by a certified public accounting firm having a minimum staff of ten certified public accountants and being a member of the American institute of certified public accountants, and, if doing business in West Virginia, being a member of the West Virginia society of certified public accountants. The financial and compliance audit shall be made of the trust fund's books, accounts and records, with respect to its receipts, disbursements, investments, contracts and all other matters relating to its financial operations. Copies of the audit report shall be furnished to the governor, state treasurer, state auditor, president of the Senate, speaker of the House of Delegates, council of finance and administration and consolidated public retirement board.

(b) The trust fund shall produce monthly financial statements and deliver them to each member of the board and the executive secretary of the consolidated public retirement board as established in sections one and two, article ten-d, chapter five of this code and to the commissioner of the bureau of employment programs as administrator of the workers' compensation fund and coal-workers' pneumoconiosis fund, as established in section one, article one, and section one, article three, and section seven, article four-b, chapter twenty-three of this code.

(c) The trust fund shall deliver in each quarter to the council of finance and administration and the consolidated public retirement board a report detailing the investment performance of the retirement plans.

(d) The trust fund shall cause an annual performance audit to be made by a nationally recognized fiduciary service. The trust fund shall furnish copies of the audit report to the governor, state treasurer, state auditor, president of the Senate, speaker of the House of Delegates, council of finance and administration and consolidated public retirement board.

(e) The trust fund shall provide any other information requested in writing by the council of finance and administration.

(f) All statements and reports required in this section shall be available for inspection

by the members and beneficiaries and designated representatives of the participant plans.

### § 44–6B–8. Fees for service

The trust fund shall charge fees, as adopted at the annual meeting, for the reasonable and necessary expenses incurred by the trust fund in rendering services to the participant plans. The fees shall be subtracted from the total return of the trust fund, and the net return shall be credited to the participant plans. All fees which are dedicated or identified or readily identifiable to an individual participant plan shall be charged against that plan, and all other fees shall be charged as a percentage of assets under management. At its annual meeting, the board shall adopt a fee schedule and a budget reflecting fee structures.

### § 44–6B–9. Transfers to the trust

(a) The West Virginia state board of investments shall transfer to the West Virginia trust fund the computers, and other necessary items of equipment associated with each position at the board of investments whose responsibilities and obligations shall as of the effective date of this section be performed by the West Virginia trust fund.

(b) Any state employee who terminates his or her state employment and becomes employed by the West Virginia trust fund may at his or her option defer retirement within the public employees retirement system pursuant to section twenty-one, article ten, chapter five of this code, or, may elect to transfer to the West Virginia trust fund his or her employee contributions, with accrued interest, and, if vested, his or her employer contributions, with accrued interest. The West Virginia consolidated public retirement board shall transfer to the West Virginia trust fund the said contributions and accrued interest of terminating employees who so elect. The trust fund shall establish a private, nonstate retirement plan for the West Virginia trust fund employees, and the said transferred employee and employer contributions and interest shall be deposited to the private retirement plan.

(c) Upon the effective date of this article, no more than seven hundred thousand dollars of those funds remaining in the special revenue accounts known as the "loss legal expense fund" and the "security lending fund" and further known as WVFIMS accounts 8563 and 8565 shall be transferred to the West Virginia trust fund board for its use in the beginning operations of the trust fund.

### § 44–6B–10. Trust indenture

The governor, on behalf of the state, shall enter into a trust indenture with the West Virginia trust fund as trustee, effective on the first day of July, one thousand nine hundred ninety-six. The trust indenture shall contain the following provisions:

(a) Simultaneously with the execution of the trust indenture, the state shall have delivered to the trustee all the assets of the consolidated pension fund with any other property that may be transferred hereafter to the trustee by the state, or by any other person or entity, which shall be used as provided in the trust indenture and which constitutes the trust estate. The trustee shall acknowledge receipt of the assets and agree to hold the assets, and any other property that later may be added to the trust, and to perform the duties of trustee, according to the terms and conditions set forth in this trust indenture and in the provisions of the "West Virginia Trust Fund Act."

(b) The Legislature hereby reserves the following rights and powers:

(1) The right by supplemental agreement to amend, modify or alter the terms of this trust without consent of the trustee, or any beneficiary; and

(2) The right to request and receive additional information from the trustee at any time.

(c) The state directs the trustee to establish a trust for the participant plans specified by the state with the earnings and losses accounted for and charged individually to each participant plan, including, but not limited to, the following:

(1) The public employees retirement system;

(2) The teachers retirement system;

(3) The West Virginia state police retirement system;

(4) The death, disability and retirement fund of the department of public safety;

(5) The judges' retirement system;

(6) The pneumoconiosis fund; and

(7) The workers' compensation fund.

(d) In the administration of the trust created by the trust indenture, the trustee has the following powers:

(1) To purchase, retain, hold, transfer and exchange, and to sell, at public or private sale, the whole or any part of the trust estate upon such terms and conditions as it considers advisable;

(2) To invest and reinvest the trust estate or any part thereof, in any kind of property, real or personal, including, but not limited to, mortgage or mortgage participations, common stocks, preferred stocks, common trust funds, bonds, notes or other securities, notwithstanding the provisions of articles five and six, chapter forty-four of the code of West Virginia, one thousand, nine hundred and thirty-one, as amended;

(3) To carry the securities and other property held under the trust indenture either in the name of the trustee or in the name of its nominee;

(4) To vote, in person or by proxy, all securities held under the trust indenture, to join in or to dissent from and oppose the reorganization, recapitalization, consolidation, merger, liquidation or sale of corporations or property; to exchange securities for other securities issued in connection with or resulting from any transaction; to pay any assessment or expense which the trustee considers advisable for the protection of its interest as holder of any such securities; to deposit securities in any voting trust or with any protective or like committee, or with a trustee depository; to exercise any option appurtenant to any securities for the conversion of any securities into other securities; and to exercise or sell any rights issued upon or with respect to the securities of any corpora-tion, all upon terms the trustee considers advisable;

(5) To prosecute, defend, compromise, arbitrate or otherwise adjust or settle claims in favor of or against the trustee or other trust estate;

(6) To employ and pay from the trust estate legal and investment counsel, brokers and such other assistants and agents as the trustee considers advisable; and

(7) To develop, implement and modify an asset allocation plan for each participant plan. The asset allocation plans shall be implemented within the management and investment of the trust fund.

(e) All trust income shall be free from anticipation, alienation, assignment or pledge by, and free from attachment, execution, appropriation or control by or on behalf of, any and all creditors of any beneficiary by any proceeding at law, in equity, in bankruptcy or insolvency.

(f) The trustee may receive any other property, real or personal, tangible or intangible, of any kind whatsoever, that may be granted, conveyed, assigned, transferred, devised, bequeathed or made payable to it by the state, or by any other person or entity, for the purposes of the trust created by the trust indenture, and all such properties shall be held, managed, invested and administered by the trustee as provided in the trust indenture and in the "West Virginia Trust Fund Act."

(g) The trustee shall promptly cause to be paid to the state the amounts certified by the governor as necessary for the monthly payment of benefits to the beneficiaries of the trust.

(h) The trustees shall render an annual accounting to the state not more than one hundred twenty days following the close of the fiscal year of the trust.

(i) The trust created by this indenture is not invalid by reason of any existing law or rule against perpetuities or against accumulations or against restraints upon the power of alienation, but the trust may continue for such time as necessary to accomplish the purposes for which it is established.

488

(j) If any provision of the trust indenture is void, invalid or unenforceable, the remaining provisions are nevertheless valid and shall be carried into effect.

## § 44–6B–11. Standard of care

Any investments made under this article shall be made with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

(a) Trustees shall discharge their duties for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b) Trustees shall diversify fund investments so as to minimize the risk of large losses unless, under the circumstances, it is clearly prudent not to do so;

(c) Trustees shall defray reasonable expenses of investing and operating the fund; and

(d) Trustees shall discharge their duties in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this article.

## § 44–6B–12. Limitations on investments

The trust fund shall limit its asset allocation and types of securities to the following:

(a) Through the first day of July, one thousand nine hundred ninety-seven, the trust fund shall hold in equity investments no more than twenty percent of its total portfolio and no more than twenty percent of the assets of any individual participant plan; after the first day of July, one thousand nine hundred ninety-seven, and through the first day of July, two thousand, the trust fund shall hold in equity investments no more than forty percent of its total portfolio and no more than forty percent of the assets of any individual participant plan; after the first day of July, two thousand, the trust fund shall hold in equity investments no more than sixty percent of its total portfolio and no more than sixty percent of the assets of any individual participant plan.

(b) The trust fund shall hold in international securities no more than twenty percent of its portfolio and no more than twenty percent of the assets of any individual participant plan.

(c) The trust fund may not at the time of purchase hold more than five percent of its equity portfolio in the equity securities of any single company or association: *Provided,* That if a company or association has a market weighting of greater than five percent in the Standard & Poor's 500 index of companies, the trust fund may hold securities of that equity equal to its market weighting.

(d) The trust fund may not hold more than twenty percent of its portfolio in commercial paper. Any commercial paper at the time of its acquisition shall be in one of the two highest rating categories by an agency nationally known for rating commercial paper.

(e) At no time shall the trust fund hold more than seventy-five percent of its portfolio in corporate debt. Any corporate debt security at the time of its acquisition shall be rated in one of the four highest rating categories by a nationally recognized rating agency.

(f) No security may be purchased by the trust fund unless the type of security is on a list approved by the trust fund board. The board may modify the securities list at any time, and must give notice of that action pursuant to subsection (g), section four of this article, and must review the said list at its annual meeting.

(g) The board, at the annual meeting provided for in subsection (i), section four of this article, shall review, establish and modify, if necessary, the investment objectives of the individual participant plans, as incorporated in the investment policy statement of the trust, so as to provide for the financial security of the trust fund, giving consideration to the following:

(1) Preservation of capital;

(2) Diversification;

(3) Risk tolerance;

(4) Rate of return;

(5) Stability;

(6) Turnover;

(7) Liquidity; and

(8) Reasonable cost of fees.

WORKMAN, Chief Justice, concurring:

I write separately to re-emphasize that the opinion of the majority is dictated by the clear, unambiguous language on the face of the West Virginia Constitution. That language patently states: *"nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever."* W. Va. Const. art. X, § 6 (emphasis supplied).

As we stated in *State ex rel. Gainer v. West Virginia Board of Investments,* 194 W.Va. 143, 459 S.E.2d 531 (1995), we agree that "the statute authorizing these investments [West Virginia Code § 12–6–9(j) ] may reflect sound investment strategy" and "that investments in the stock market would likely produce a greater return over the long term for the consolidated fund, if prudently invested, than is currently being realized." 194 W.Va. at 149–50, 459 S.E.2d at 537–38. But the issue before us is *not* whether investment of state funds is a good idea—but rather, whether it is constitutional! Judges swear an oath to uphold the Constitution of the United States, and the Constitution of the State of West Virginia. If we keep that oath, we are not free to selectively pick and choose which provisions of that constitution we will uphold. Because all three branches of government seem to agree that wise investment of state funds in corporate stocks would be desirable, the proper remedy is for the Legislature to submit a constitutional amendment to the people of West Virginia that would permit such investments.

We have heard it argued in these cases that the citizens of this State will not pass such a constitutional amendment. If an amendment is worded in a fashion that conveys its purpose (*i.e.,* to permit prudent investment of state funds to ensure the solvency of pension funds) and an effective job of public education is done, I believe strongly enough in the basic good sense and intelligence of the people of West Virginia that such an amendment can pass. Beyond the issue of whether a constitutional amendment can be passed if presented to the people, we cannot ignore a clear provision of the state constitution simply because we don't like it or the result it obtains, or because it's the most politically expedient manner of accomplishing a desired result.

The contention raised by the dissent that the majority opinion ignores the well-settled law of trusts is nonsense. As the majority points out, "by simply declaring that the state has no ownership interest in the funds ..." does not make it so. One cannot make a prince out of a frog by simply calling it a prince.

The dissent argues further that syllabus point one is *"all"* that needs to be said. I agree that syllabus point one is a vitally important principle of law, when read in its *entirety.* The dissent, however, seems not to recognize a vital phrase in syllabus point one. That phrase is "within constitutional limits." I could not in good conscience choose not to uphold the Constitution in light of such a clear, unequivocal prohibition. Let us hope the Legislature will trust the people of West Virginia and seek to amend the constitution in the proper manner, by presenting the amendment to the people.

MAYNARD, Justice, dissenting:

I respectfully dissent because I believe the decision of the majority in this case is simply wrong. This case establishes bad policy, makes bad law and reaches a bad result. To reach the result the majority wanted in this case they had to make a giant leap over a huge body of well-settled trust law. Anybody who can jump that high ought to be making Nike commercials.

All courts and all judges occasionally make bad decisions. You always hope when you do it will be in some minor matter that affects a very small number of people. Unfortunately, this decision adversely affects literally thousands of West Virginians and will have a devastating effect on all of State Government. If you were going to pick a case in which to be wrong, this is the very worst you could choose. This decision is simply a fiscal disaster.

There are two fundamental flaws in this decision. First, it violates the doctrine of separation of powers by striking down a valid and legal statute and usurps the legitimate power of the legislature which enacted the statute and the executive who signed it into law. This Court is doing what all courts do everywhere in our nation today: govern by court decision. Syllabus Point 1 of this case is *all* that needs to be said in this decision. Just in case you missed it, here it is again:

> "In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt."

Syllabus Point 1, *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965).

I only wish the majority really meant what they said.

Second, this case simply ignores a very large body of the well-settled law of trusts. The legal concept of trusts has been recognized in our law for hundreds of years. One of the basic elements of every irrevocable trust is the transfer of title of assets from the trustor to the trustee. Therefore, the person or entity holding title is the trustee and *not* the trustor. The West Virginia Education Association said it very well in its brief citing Syllabus Point 2 of *Dadisman v. Moore,* 181 W.Va. 779, 384 S.E.2d 816 (1988):

> A "trust" is a legal relation between two or more persons by virtue of which one is bound to hold property to which he has the legal title, for the use or benefit of the other or others who have an equitable title or interest. It is a right, enforceable in equity, to the beneficial enjoyment of property, real or personal, of which the legal title is in another. The person so holding the legal title or interest is called the "trustee," and the one having the equitable interest and entitled to the benefit is the beneficiary or "cestui que trust." The person creating the trust is called the "trustor" or "settlor." An essential feature of trusts is the division of the title to property, the vesting of the legal title in the trustee and of the equitable title or beneficial interest in the cestui que trust.

Legal title to any stock in any corporation owned by the Trust Fund would rest solely with the trustee of the Fund and would not be held by the State.

For the foregoing reasons, I believe the statute in question does not violate our Constitution, and accordingly, I dissent.